In re **MARVEL ENTERTAINMENT GROUP, INC.; The Asher Candy Company; Fleer Corp.; Frank H. Fleer Corp.; Heroes World Distribution, Inc.; Malibu Comics Entertainment, Inc.; Marvel Characters, Inc.; Marvel Direct Marketing Inc.; and Skybox International, Inc., Debtors.**

**No. Civ.A. 97–638–RRM.**

United States District Court,
D. Delaware.

May 13, 1999.

Collins J. Seitz, Jr., and Karen C. Bifferato, Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Michael R. Griffinger, Frank J. Vecchione, and Karen A. Giannelli, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, New Jersey, for John J. Gibbons, Chapter 11 Trustee.

David B. Stratton, Pepper Hamilton LLP, Wilmington, Delaware; Lawrence C. Ashby, Ashby & Geddes, Wilmington, Delaware; Douglas L. Furth, and David Fleischer, Battle Fowler LLP, New York, for Debtors, Marvel Enterprises, Inc.

Michael B. Joseph, and Theodore J. Tacconelli, Ferry & Joseph, Wilmington, Delaware; Tonny K. Ho, Francis J. Menton, Jr., Elvin Esteves, and Catherine E. Larocca, Willkie Farr & Gallagher, New York, for the Official Committee of Unsecured Creditors.

Stephen W. Spence, Phillips, Goldman & Spence, Wilmington, Delaware; Edward S. Weisfelner, and Bari J. Mattes, Berlack, Israels & Liberman LLP, New York, for Standby Purchasers.

Thomas L. Ambro, Mark D. Collins, Daniel J. DeFranceschi, and Margaret H. Morgan, Richards, Layton & Finger, Wilmington, Delaware; Chaim J. Fortgang, Douglas S. Liebhafsky, Amy R. Wolf, Douglas K. Mayer, and David C. Bryan, Wachtell, Lipton, Rosen & Katz, New York, for the Secured Lenders.

Jeffrey C. Wisler, Williams, Hershman & Wisler, P.A., Wilmington, Delaware; Richard S. Toder, and Andrew D. Gottfried, Zalkin, Rodin & Goodman LLP, New York, for The Chase Manhattan Bank, as DIP Agent.

Teresa Currier, and Adam G. Landis, Duane, Morris & Heckscher, LLP, Wilmington, Delaware; Leon R. Barson, Gary M. Schildhorn, Steven D. Usdin, and Gary

D. Bressler, Adelman Lavine Gold and Levin, Philadelphia, Pennsylvania, for the Official Committee of Equity Security Holders.

Norman L. Pernick, Saul, Ewing, Remick & Saul, Wilmington, Delaware, for Marvel Holdings.

Joanne Wills, and David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware; James E. Spiotto, Ann Acker, Franklin H. Top, III, and Timothy T. Finley, Chapman & Cutler, Chicago, Illinois, for LaSalle National Bank as Indenture Trustee.

Patricia A. Staiano, Frederick J. Baker, and John D. McLaughlin, Jr., Office of the U.S. Trustee, Philadelphia, Pennsylvania, United States Trustee.

## OPINION

MCKELVIE, District Judge.

This is a bankruptcy case. On December 27, 1996, Marvel Entertainment Group, Inc. and certain of its subsidiaries filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On November 17, 1997, this court withdrew the reference to the bankruptcy court and, thereafter, entered an order authorizing appointment of a Chapter 11 trustee. The United States Trustee selected former Chief Judge of the United States Court of Appeals for the Third Circuit John J. Gibbons to serve as trustee. This court entered an order on December 22, 1997 approving that appointment.

On July 31, 1998, the court entered a consent order approving a plan of reorganization for the companies. Gibbons has been discharged from his duties as trustee and has applied for $2,095,760.38 in compensation for the nine months he served as trustee. Marvel Enterprises and the Official Committee of Unsecured Creditors object to his application. This is the court's decision on the application.

## I. FACTUAL BACKGROUND

The following facts are drawn from the record of the proceedings in this matter and from the testimony and documents offered into evidence at the December 17, 1998 and January 7, 1999 hearings on the application.

### A. December 1996: Marvel Files Chapter 11 Petitions and a Proposed Plan of Reorganization

On December 27, 1996, Marvel Entertainment Group, Inc. and certain of its subsidiaries (hereinafter "Marvel") filed separate petitions in the Bankruptcy Court for relief under Chapter 11. The court consolidated the petitions. On that same day, Marvel's parent corporations, Marvel Holdings, Inc., Marvel (Parent) Holdings, Inc., and Marvel III Holdings, Inc. (collectively referred to as "the Marvel Holding Companies"), also filed Chapter 11 petitions in the Bankruptcy Court. The court has consolidated and separately administered those cases.

At the time of filing of the petitions, Ronald O. Perelman controlled Marvel through the Holding Companies, which owned 80% of Marvel's common stock. Perelman had, however, pledged that stock to an indenture trustee as security for the repayment of bonds Marvel Holdings had issued in 1993 and 1994 in a face amount of $894 million. Separately, Marvel owed certain banks (the "Secured Lenders"), including Chase Manhattan Bank, approximately $625 million.

Marvel had approximately 1,400 employees. Its assets included the rights to a number of popular comic book and entertainment characters, such as Spiderman and The Incredible Hulk. Another asset was Toy Biz, Inc. common stock. In 1993, Perelman joined with two individuals, Avid Arad and Isaac Perlmutter, to form Toy Biz. Marvel granted Toy Biz certain licenses for its characters in exchange for 44% of Toy Biz's common stock. Under a shareholders' agreement, Marvel con-

trolled 78% of Toy Biz's voting stock so long as Perelman controlled Marvel.

On the filing of the petitions, Marvel filed a proposed plan of reorganization by which a Perelman affiliate would contribute $365 million to Marvel in exchange for an 80% stake in the company, which would then be merged with Toy Biz and reorganized. Under the plan, all unsecured creditors would be paid in full, and the existing obligations to the Secured Lenders would be restructured. Chase agreed with a syndicate of banks to provide Marvel $100 million in senior secured debtor-in-possession financing for a period of up to 120 days, extendable to 180 days. In addition, the syndicate agreed to provide Marvel another $160 million in exit financing.

### B. *June 1997: The Bondholders Take Control of Marvel's Board of Directors*

What apparently started as a relatively friendly bankruptcy managed by Perelman and Marvel's Secured Lenders led by Chase, turned into a full scale commercial rumble after the bondholders, led at times by the indenture trustee for the bonds, LaSalle National Bank, and by Carl C. Icahn and affiliated entities, including High River Limited Partnership, Westgate International L.P. and Vincent J. Intrieri (hereinafter sometimes collectively referred to as "the Icahn Interests"), took control of the Marvel Holding Companies and on June 20, 1997 voted the pledged shares to replace Marvel's board of directors. *See In re Marvel Entertainment Group, Inc.,* 209 B.R. 832 (D.Del.1997).

With Perelman's removal from the Marvel board, his designees on the Toy Biz board resigned. On June 22, 1997, the new Marvel board sought to add Icahn and seven others to the Toy Biz board. The next day, Perlmutter, Arad and the rest of the incumbent Toy Biz board chose different individuals to fill the vacant directorships. That same day, Toy Biz, Arad and Perlmutter filed an adversary proceeding in the bankruptcy court seeking an order

declaring the incumbent Toy Biz board of directors, and the directors it selected on June 23 to be the duly elected board.

Following the change in control of Marvel, Chase and the Secured Lenders argued Marvel was insolvent and moved for the appointment of a trustee. At this point, Bankruptcy Court Judge Helen Balick told counsel to stop litigating and directed them to reach a settlement. In an apparent effort to back up her admonitions, Judge Balick issued an order *sua sponte* vacating her December 27, 1996 Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals. Unfortunately, her swat may have only aggravated the tensions, as it did not hit the principal players (Chase or Icahn), but did punish bystanders, as it stopped interim payment of fees to counsel for the Official Committee of Unsecured Creditors and for the Official Committee of Equity Security Holders and to their financial advisors.

By August 1997, Chase and Icahn were close to agreeing on a settlement by which the Icahn Interests would purchase most of the Secured Lenders' claims and liens. That deal fell through, perhaps in part because another player had joined the table. Mark Dickstein had filed a Schedule 13D with the Securities and Exchange Commission disclosing that over the summer he had acquired 5.5% of Toy Biz's Class A shares as an "investment." On October 16, Dickstein filed an amended Schedule 13D, disclosing that he had entered into a contract with Toy Biz and holders of Marvel debt in connection with a proposed reorganization plan that contemplated a "hostile" merger of the Marvel and Toy Biz entities.

On October 30, 1997, Marvel's new board of directors caused Marvel to file an 82 page, 19 count complaint against 33 defendants, including Perelman, Chase and the other secured lenders (this complaint and related claims are sometimes hereinaf-

ter referred to as "the Perelman Litigation"). In the complaint, Marvel alleged Chase had a long-standing and far-reaching relationship with Perelman and that Chase and others had aided and abetted Perelman in systematically stripping Marvel of its most valuable assets, encumbering it with debt, wrongfully filing the bankruptcy proceedings and then, when their bankruptcy plan failed, embarking on a deliberate campaign designed to drive Marvel to the brink of liquidation. Marvel alleged Perlmutter, Arad and Dickstein had joined Perelman and Chase in efforts to cripple Marvel and had wrongfully proposed to merge Marvel and Toy Biz in a transaction that would destroy Marvel and the interests of the bondholders and Marvel's shareholders.

That same day, Marvel moved for a temporary restraining order. In its motion, Marvel alleged Toy Biz was attempting to sabotage Marvel's efforts to reorganize and sought an order replacing Toy Biz's board with Marvel's nominees. Three days later, Marvel moved this court to enter an order withdrawing the order that had referred this matter to the bankruptcy court.

By the end of November, and after a few additional twists and turns, the court had withdrawn the reference. The new board had caused Marvel to file a proposed plan of reorganization. Under the Marvel plan, that is to say the Icahn Interests' plan, the assets of the company would be transferred to a new corporation free and clear of all liens and claims. The new corporation would be owned by a trust. The trust would receive 100% of the corporation's common stock, $135 million in cash, and Marvel's litigation claims, including its claims in the Perelman litigation.

Toy Biz and certain secured lenders filed an alternative plan by which Marvel and Toy Biz would be merged. Under this plan, the Secured Lenders would receive cash and a combination of common and convertible preferred stock. Unsecured creditors would receive warrants to purchase common stock. Marvel's stockholders would receive subscription rights to purchase common stock. Any claims Marvel had against the Secured Lenders and Toy Biz, including claims set out in the Perelman litigation, would be released. Other claims Marvel might have, including claims against Perelman and claims to avoid prior payments made by Marvel, would be transferred to a litigation trust, with the unsecured creditors receiving 5% of the avoidance action recoveries and 10% of any amounts recovered in the Perelman litigation. The Secured Lenders agreed to support the plan (and not sell their claims to the Icahn Interests) so long as certain milestones were met. One agreed upon milestone was that the court approve the plan disclosure statement by February 15, 1998.

### C. December 1997: The Court Enters an Order for the Appointment of a Trustee

In December 1997, the court invited the Secured Lenders to renew their motion for appointment of a trustee. The Icahn Interests then moved for the appointment of an examiner, rather than a trustee.

In opposing appointment of a trustee, the Official Committee of Bondholders argued the Secured Lenders did not want a neutral trustee. Rather, the Committee alleged the Secured Lenders expected to control the trustee and force the liquidation of Marvel. They argued that Chase could no longer speak for the Secured Lenders, as it had a separate agenda, including an interest in obtaining a broad release from claims asserted in the Perelman litigation as well as an interest in preserving its commercial relationship with Perelman.

LaSalle National Bank, as indenture trustee for the bondholders, also opposed the motion, arguing:

> Chase has claimed that its motion seeks the appointment of a "neutral" and "independent" party to mediate the dispute

between the parties. These statements do not accurately describe the Lenders' actual purpose behind the motion, which is the ouster of the New Board in favor of a pre-selected agent who will carry out their demands.

The Official Committee of Equity Security Holders opposed the motion for a trustee, arguing:

> The Trustee Application is nothing more than another skirmish in the same war. The fight over control should not be viewed in a vacuum. If the pre-petition lenders win, they expect to gain, and what they expect to gain is control over corporate governance through an agent they will control by their vote or by their control over the purse strings.

The Official Committee of Unsecured Creditors supported the motion for appointment of an examiner, rather than a trustee. The Committee argued that appointing an examiner would have the advantage of obtaining an independent and neutral evaluation of the Perelman litigation, while avoiding the disadvantages that would flow from appointing a trustee, including the probable disruption to the business by another change in senior management, the significant additional administrative costs associated with the trustee's appointment, and the further delays the appointment would cause before this case could be brought to resolution.

In supporting their motion for appointment of a trustee, the Secured Lenders accused Icahn of planning an elaborate scheme to take over Marvel by buying the bonds at a discount and then reducing the value of the Lenders' claims. They contended the Perelman litigation was part of that scheme, and was brought, at least in part, as a weapon to punish the Secured Lenders for not reaching a settlement. In addition, Chase argued that if the court did not appoint a trustee, Chase would not be inclined to continue providing interim financing to Marvel, which was then in default under agreements relating to $92 million in debtor-in-possession loans.

The U.S. Trustee, Patricia Staiano, joined in the motion for the appointment of a trustee, reporting that the Secured Lenders and Bondholders had demonstrated an "apparent inability ... to reach consensus."

At a December 12, 1997 oral argument on the motions, Chase's counsel reported that the Secured Lenders had no particular candidate for trustee. They had submitted a list of approximately 70 candidates to the U.S. Trustee and would accept anyone on that list or a candidate of comparable stature. Counsel also reported they would not seek an election to run another candidate, provided the individual selected did not have ties to any of the parties in interest "because that's the whole point, is to get somebody neutral."

Counsel for the U.S. Trustee offered the following description of the selection process:

> We have a short form application. What we do is once we have identified an individual who says he or she is ready to do it, then we send them basically a verified statement asking are you related to anybody, do you have any conflicts.... It's basically, a form. They fax that back to us. Once they have averred in an affidavit to us that they are not conflicted, then we would prepare a very short application to the Court indicating that the U.S. Trustee pursuant to 1104 and 2007.1, which is the rule, ha[s] selected Sally Smith as the trustee and we ask the Court to approve that application. Then that would be presented to you at your first available opportunity. Again, of course we would provide copies to parties in interest, but it's not something that goes out on notice and hearing. Then if you accept that nominee, then you would sign the order and that would be it.

Counsel for Icahn commented:

> What I didn't hear was anything about a focus on qualifications. And we have read the listing of the alternative dispute

resolution individuals. We're part of the same organization. All of them have excellent credentials as neutrals. They serve in capacities where they resolve disputes. They mediate disputes. They arbitrate disputes. They mock trial disputes. I don't know what that there is anyone on that list, as qualified as they are for the jobs they do, that have run a media enterprise, a licensing business, know anything about movies or television production or the business of Marvel. I just raise that as an observation and a concern about what it is that a trustee will do with regard to the best interest of the estate, which is the ... standard.

D. *December 1997: The Court Schedules a Hearing on Toy Biz and the Secured Lenders' Plan of Reorganization and Enters an Order for the Appointment of a Trustee*

By an Order dated December 12, 1997 and an Opinion dated December 16, 1997, the court found the proceedings and papers filed to date demonstrated there was a deep-seated conflict and animosity between the Secured Lenders and Marvel, as controlled by the Icahn Interests, and that there was no reasonable likelihood the parties would be able to bring this matter to an amicable resolution. The court found the best way to proceed would be to do two things: First, the court set a schedule for a prompt resolution of the matters in dispute. To that end, the court scheduled a hearing for January 30, 1998 on Toy Biz and the Secured Lenders' proposed plan of reorganization, and a jury trial on October 1, 1998 for the Perelman litigation. Second, the court entered an order for the appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(2). In doing so, the court expected a trustee would be able to offer a neutral assessment of the value of the Perelman litigation and the two proposed plans, and would be able to invite different plans if necessary.

Marvel moved for a stay of the order for the appointment of a trustee and filed an appeal in the United States Court of Appeals for the Third Circuit.

E. *December 1997: The U.S. Trustee Selects John J. Gibbons as the Candidate for Trustee*

At the close of a hearing on Monday, December 22, where counsel for some but not all of the parties were in attendance, counsel for the U.S. Trustee announced she had selected a trustee, identified the former Chief Judge of the United States Court of Appeals for the Third Circuit John J. Gibbons as the candidate, and submitted a form of order to the court approving the appointment. In submitting the paper, counsel for the U.S. Trustee reported:

MR. McLAUGHLIN: You Honor, if I may. I have with me the original application of the United States Trustee to appoint John J. Gibbons as the Chapter 11 trustee. If I may Bench-file this and ask for the Court's consideration at this time.

THE COURT: Anybody want to comment on this motion? Or at least application for relief?

He has been screened for conflicts?

MR. McLAUGHLIN: Yes, Your Honor. The application has attached to it his verified statement, which is akin to a verified statement pursuant to Rule 2014, setting forth his connections with the U.S. Trustee, with the Court, with principal parties-in-interest, and the disclosures he has made. The U.S. Trustee has examined—we are satisfied there are no disqualifying conflicts of interest, and so on and so forth. And we would ask that the Court approve the application pursuant to Rule 2007.1.

THE COURT: He has told you he is going to roll up his sleeves?

MR. McLAUGHLIN: Yes, Your Honor. And he has that reputation. That is one reason why the U.S. Trustee was favorably disposed to his candidacy, because

he has a track record of being an on-site manager.

THE COURT: Is his professional rate in here, fees he will be charging?

MR. McLAUGHLIN: No, Your Honor. Trustees are not paid hourly. They are paid based upon disbursements made from the estate. So arguably he is not entitled to any money until he pays money out to creditors. It is a percentage compensation pursuant to Section 326 of the Bankruptcy Code.

Now, to the extent that he will be seeking—he may come in here and seek some sort of interim compensation, which is provided for in the Code. But that would have to be determined upon what activity he has generated in the estate, and arguably what disbursements he has made. He is not entitled to an hourly rate on a lodestar calculation, like lawyers and accountants would be.

THE COURT: What is his expectation for what he will make? What has he been told what the potential for compensation is?

MR. McLAUGHLIN: I think they recognize that this case could be worth billions of dollars. I don't know that we ever directly approached him, because we weren't looking for somebody who was out to use this as a springboard to fame and success. We were looking for someone essentially who had the gravity of demeanor that was above worrying about how much he was going to get paid.

I don't think it's any secret that this is a several-hundred-million-dollar company. And again, a trustee pursuant to the statute is paid a commission based upon disbursements.

So I think there is an expectation on the part of the trustee that his commission will be a reasonable amount, and of course he will have his professionals, who will be paid in a lodestar amount. But there really wasn't—I was there during the interview. There was really no discussion about what he was going to be paid.

THE COURT: Anybody want to comment on this?

MR. BRYAN: Your Honor, on behalf of the secured lenders. There is a statutory percentage fee which is applicable in the ordinary case. In a case like this, where you are talking about hundreds and hundreds of millions of dollars, a percentage fee is not generally the appropriate—I don't think I am disagreeing with Mr. McLaughlin.

MR. McLAUGHLIN: It is a cap.

MR. BRYAN: There does need to be a negotiation between the parties in the case with the trustee. I haven't seen the, personally seen the application or the form of order. But to the extent it addresses that, I think that is something that the parties in the case and the trustee need to address as a negotiation point.

I would ask that, with respect to his compensation, that not be—

MR. McLAUGHLIN: The compensation is not addressed in this application, Your Honor. Respectfully, this does not turn on compensation. This is merely to get him on board. If the banks want to negotiate—clearly, the trustee is going to have to negotiate because the banks are secured, presumably, on all the assets of the estate. Again, the statutory compensation is a max. Counsel is correct. There is no guarantee he gets the whole amount. It's three percent.

THE COURT: Three percent. What is to prevent him from getting the whole?

MR. McLAUGHLIN: You.

THE COURT: He makes the application for up to three percent and I determine what is reasonable.

MR. McLAUGHLIN: That's right. When the case is commenced, like any other fiduciary, he submits a final report on account of his administration. Therein, he would say, I have disbursed

80 million dollars, and I want—it's like five percent of the first thousand dollars, a sliding scale. But basically, for anything over like $5,000, it's three percent. So presumably he would come in and ask for the whole amount. The parties-at-interest could comment as they see appropriate. The Court could award him such compensation.

THE COURT: That is all I want to know. I don't want to give up a percentage of a large estate, if the matter gets settled next week, I don't want him walking away with 30 million.

MR. McLAUGHLIN: No, Your Honor. Under 326, you control the purse strings and you compensate the trustee as you deem to be appropriate in accordance with the law.

THE COURT: I will enter an order that reads: The Court, having considered the U.S. Trustee's application to appoint John J. Gibbons, Esq., as Trustee of the above-captioned administered cases, it is hereby ordered his appointment is approved.

I will sign that order dated today. Look forward to him coming in.

MR. STRATTON: I wanted to put on the record that Toy Biz as a plan proponent has an interest in the trustee's compensation, and we reserve our rights to argue this with respect to the application of 326 to his compensation and the limit of reasonableness. Thank you.

THE COURT: All right.

MR. McLAUGHLIN: Your Honor, the U.S. Trustee is not seeking any determination of compensation at all. That is a battle for another day. I would ask, if the Court is inclined to enter the order, if I may, at the conclusion of the hearing, get a copy so I can fax it back to my office and put it in the stream of commerce, as it were, because numerous people have to be notified and the trustee will have to contact the bonding company to get a bond and all that sort of thing.

THE COURT: There you are.

On December 23, 1997, the court entered an order denying Marvel's motion for a stay of the order providing for the appointment of a trustee.

F. *January 1998: The Court Denies Gibbons's Motion to Retain Gibbons Del Deo*

On January 2, 1998, Gibbons moved for an order authorizing him to employ as his legal counsel his partners, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, of Newark, New Jersey, and Collins J. Seitz, Jr., Esq. and the Wilmington, Delaware firm of Connolly, Bove, Lodge & Hutz.

On January 12, the Indenture Trustee filed a paper titled "Preliminary Statement" reporting it had learned that Gibbons Del Deo represented Chase Manhattan Bank. Apparently, Gibbons disclosed this representation to the U.S. Trustee prior to his appointment, but the U.S. Trustee failed to disclose this information to certain parties until after the court had entered the order approving Gibbons's appointment. In the paper, the Indenture Trustee suggested the court consider whether Gibbons and Gibbons Del Deo were disinterested and, if not, whether Gibbons's motion to retain Gibbons Del Deo should be denied and Gibbons disqualified as trustee.

The Icahn Interests were more direct. They filed a paper objecting to Gibbons's application to retain his partners and stated:

As this Court well knows, Chase's pre- and post-petition activities have been the subject of intense scrutiny and recent litigation in these cases. The Trustee will be required to investigate such matters so as to determine whether or not to continue to prosecute this litigation on behalf of the Debtors. It is inconceivable that Chase's position as a past and continuing client of [Gibbons Del Deo] will not either influence [Gibbon Del Deo's] analysis of the claims against Chase or imperil the public's perception

regarding the integrity of such analysis. Given its relationship with Chase, [Gibbons Del Deo] is not a disinterested person and cannot be retained pursuant to Section 3279(a) of the Bankruptcy Code.

On January 13, Gibbons filed a paper reporting that on December 19, 1997, Chase had waived any potential or actual conflict arising from Gibbons's appointment as trustee and that on January 12, Chase and Gibbons Del Deo had terminated any Gibbons Del Deo representation of Chase.

The court heard argument on Gibbons's motion on January 15. On that day, in response to Gibbons's request, the court rescheduled the hearing on the Toy Biz and Secured Lenders' Plan from January 30 to February 13, and reset to February 6 the date by which the Trustee would serve objections, if any, to the plan.

On January 27, 1998, the court denied Gibbons's motion for an order approving his employment of Gibbons Del Deo. In the Opinion, the court noted that while no party had raised the issue, there is some question about the propriety of a trustee employing his own firm as counsel. In addition, the court wrote:

[T]his focus on a possible conflict with Chase misses the point. Despite the language of section 327(c), courts have consistently found that the test for assessing the appointment of counsel has two prongs. Counsel must not only have no interests "materially adverse" to the estate, but must also be "disinterested."

\* \* \* \* \* \*

[T]he key issue raised by the present motion is not whether there exists a conflict of interest, or whether there exists an "appearance of impropriety." It is whether Gibbons Del Deo, in light of its prior representation of Chase, can fairly be said to be disinterested. In this case, this court specifically authorized the appointment of a trustee to provide a neutral party who would resolve the conflicts that were dominating the case and preventing the confirmation of a reorganization plan. The court noted in its opinion that a major component of the trustee's task would be an assessment of the Perelman litigation. Chase is a named defendant in that litigation. Yet the person who has been placed in this "neutral party" role is a named partner at a firm that has represented Chase, and he now seeks to hire that same firm as his counsel.

\* \* \* \* \* \*

Gibbons Del Deo's representation of Chase taints the image of objectivity that the trustee and his counsel should possess.

*In re Marvel Entertainment Group, Inc.,* 1998 WL 181084, at \*6–\*7, (D.Del. Jan. 27, 1998).

G. *February 1998: Gibbons Appeals and the Secured Lenders and Toy Biz File a First Amended Plan*

On February 2, Gibbons wrote to this court to report the January 27 decision was "contrary to the law in this circuit" and "will cause the Marvel estate significant harm." He noted he had filed a notice of appeal with the Third Circuit and had requested that it hear the matter immediately. In his letter, he asked the court to delay the presentation of Toy Biz and the Lenders' Plan by postponing the time for the hearing on the disclosure statement to March 30.

On February 12, Toy Biz and the Secured Lenders filed an Amended Plan that addressed a number of objections to their initial plan. At a February 13 hearing, the court scheduled a hearing on the proposed confirmation of the Amended Plan for May 4. At that hearing the court also scheduled oral argument on Toy Biz's motion for summary judgment seeking a declaration that its incumbent board of directors was duly elected and that, with Perelman's loss of control of Marvel, under the Toy Biz

shareholders' agreement Marvel lost the control of the Toy Biz board.

By a letter to the court dated March 12, 1998, counsel for Toy Biz reported that the Official Committee of Unsecured Creditors had agreed to support an amended Toy Biz and Secured Lenders' plan. The Second Amended Plan increased the cash, warrants and percentage of potential litigation proceeds that would be paid to the unsecured creditors.

On March 16, the Secured Lenders moved to postpone resolution of the dispute on the corporate governance of Toy Biz until the confirmation hearing and reported in the motion that Toy Biz and the Trustee supported their motion. Counsel for the Official Committee of Equity Security Holders and counsel for the Bondholders opposed the motion.

On March 20, the Equity Committee moved to restore the debtor as debtor-in-possession, arguing that Gibbons's appointment had become embroiled in controversy, that he had not been actively managing and operating the debtors' business, and had not undertaken investigations aimed at protecting the interests of the various creditor and shareholder constituencies. They wrote: "[T]he appointment of the Chapter 11 Trustee has merely created a vacuum at the center of the Debtors' management . . . ."

H. *March 1998: The Court of Appeals Affirms the Order to Appoint a Trustee and Reverses the Order Denying Gibbons's Motion to Hire Gibbons Del Deo*

By a decision dated March 25, 1998, the United States Court of Appeals for the Third Circuit affirmed this court's order providing for the appointment of a trustee, but reversed this court's order denying Gibbons's motion to retain his law firm, finding the court's decision was an abuse of discretion. Senior Judge Ruggerio Aldisert wrote for the panel:

The Firm's conflict here is not potential or actual. . . . The district court's exercise of its discretion is further called into question by the anomalous situation in which it approved Gibbons's appointment as the trustee in this case, and then disapproved the employment of the Firm, in which he is the first named partner, as trustee's counsel. Sauce for the goose, then is not sauce for the gander. The disclosures in reference to both Gibbons's appointment and the Firm's employment are the same. They revealed the Firm's representation of Chase and that Chase had granted the Firm an unconditional waiver of conflicts. Also, unlike when the court approved Gibbons's appointment as trustee, while the motion for approval of the Firm's employment as counsel was pending, Chase and the Firm terminated their attorney-client relationship. Given these facts, a logical basis for this inconsistency is evanescent, if not infinitesimal. There is an irreconcilable conflict with dictates of good reason in the notion that Gibbons, as the head of the Firm, is eligible to serve as trustee, but the Firm is ineligible to serve as his counsel.

This anomaly is particularly troubling and augments the primary reason why we reverse the district court's denial of the trustee's motion. We reverse the district court because it utilized a faulty premise in reaching its conclusion. It applied the incorrect legal standard and thus strayed beyond an appropriate exercise of discretion by disqualifying the firm under § 327(a) based solely on the appearance of conflict. The trustee was within his rights and prerogative to select the Firm as his counsel. To deny the trustee's choice was to commit reversible error.

*In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 477–78 (3d Cir.1998).

By an opinion dated March 30, this court granted Toy Biz's motion for summary judgment that under Toy Biz's March 2,

1995 Stockholders Agreement, Marvel's right to control Toy Biz's board of directors was terminated on June 20, 1997, when the bondholders replaced Perelman and the rest of the Marvel board.

On April 1, the Equity Security Holders withdrew their motion to restore the debtor as debtor-in-possession. On April 3, Gibbons, the Equity Committee and the Icahn Interests filed appeals with the Third Circuit from the court's March 30 summary judgment order, and the Equity Committee moved this court to enter an order staying that Order pending the appeal.

Gibbons, Toy Biz and the Secured Lenders opposed the stay. The court heard and denied the motion to stay on April 7.

On April 15, the court entered orders granting Gibbons's motions to approve employment agreements with nine Marvel executives and a license agreement between Marvel's subsidiary Fleer and the Major League Baseball Players Association.

## I. *April 1998: The Third Circuit Stays Proceedings in the District Court*

On April 13, the Third Circuit apparently sua sponte entered the following order:

> Until further order of this court the effectiveness of the summary judgment order of March 30, 1998, is stayed, as is the confirmation hearing scheduled on May 4 and May 5 to consider the Toy Biz plan of reorganization.

The next day Toy Biz filed a motion to lift the stay. In response to an inquiry from the Third Circuit on his position on the stay, Gibbons changed his position and wrote to the Court to report he now took no position on the stay. Subsequently, the Third Circuit denied Toy Biz's motion to vacate the stay order.

On April 17, Gibbons, the Equity Committee, the indenture trustee LaSalle National Bank, and the Icahn Interests filed papers objecting to Toy Biz and the Secured Lenders' amended plan of reorganization. Gibbons objected to the plan on the ground that it improperly sought to release or exculpate non-debtor third parties, including the plan proponents, from claims of the Debtor's creditors. He also objected that he had not completed an analysis of the Perelman litigation or of the liquidation value of the estate. The Equity Committee, LaSalle and Icahn objected that the plan was engineered by Toy Biz and the Secured Lenders solely for their own benefit, identified a number of specific objections to the plan, and moved for a postponement of the May 4 confirmation hearing.

On April 23, the court held a pretrial conference with counsel in preparation for the May 4 confirmation hearing. During that conference, counsel for the Equity Committee reported that the Icahn Interests had proposed an alternative plan of reorganization to Gibbons. Under that plan, if the Third Circuit reversed the summary judgment and determined that control of Toy Biz remained with Marvel, the Icahn Interests would pay off the debtor-in-possession financing, pay $100 million to retire senior liens, and contribute $158 million in equity to Marvel. Icahn expected he would not need the banks' consent to the plan as their debt and pre-petition collateral would be reinstated. Counsel reported that under this plan, if the Court of Appeals affirmed the summary judgment that Marvel had lost the right to control Toy Biz, the Icahn Interests and the Equity Committee would consent to the confirmation of Toy Biz's plan with certain modifications, which were not set out on the record, but which counsel reported the Trustee believes "are doable."

At the conclusion of the conference, the court scheduled a further pre-trial conference for May 1. The court canceled that conference, however, on April 28, as the Court of Appeals had failed to lift its stay order.

## J. *May 1998: Trustee Settles with Toy Biz and the Secured Lenders*

On May 12, Gibbons filed a motion for an order approving a settlement agree-

ment he had reached with Toy Biz, Chase, other Secured Lenders, Dickstein and others. Under the settlement agreement, Gibbons agreed to settle Marvel's claims against the settling parties that had been asserted in the Perelman litigation and to support Toy Biz and the Secured Lenders' Plan in consideration for an increase in recoveries under their Plan for the holders of Marvel equity interests, including additional warrants and a share of the proceeds from a litigation trust. Under this settlement agreement, the Secured Lenders renewed their agreement to support the Plan and agreed not to sell their debt to Icahn or others if the Plan were approved by June 30, 1998. The Trustee's motion noted that, upon the approval of the agreement, the Trustee would move the Court of Appeals to enter an order vacating the stay and deferring consideration of the summary judgment decision on Marvel's claim that it had the right to control the selection of Toy Biz's board.

With his motion, Gibbons filed a report on his analysis of the nature and strength of Marvel's claims against the settling parties in the Perelman litigation. In the report, he noted that while some of the claims may have a chance of success on the merits, they carried with them varying deficiencies in legal or factual support. Gibbons concluded that given these deficiencies and the expense and delay that would be incurred in litigating the claims, the settlement would be fair and reasonable and in the best interests of the various constituencies.

That same day the Unsecured Creditors wrote to the court to report they believed the settlement and its provision for additional warrants breached an agreement they had with Toy Biz and the Secured Lenders that there would be no changes to the Second Amended Plan that would dilute the unsecured creditors' warrants or their share of the recovery out of the litigation trust.

On May 15, 1998, Gibbons filed a motion for an order approving the sale of the Fleer's confections division. Under the transaction, Marvel would receive net proceeds of approximately $13 million.

Gibbons presented his motion on the settlement agreement on May 15. The court tentatively set a hearing on the settlement for June 12 and a confirmation hearing on the plan for June 26. Both dates were subject to the Third Circuit's lifting the stay.

K. *May 1998: The Third Circuit Lifts the Stay and the Court Approves the Trustee's Settlement and the Third Amended Plan*

On May 29, the Court of Appeals entered an order lifting the stay to the extent necessary to permit the district court to conduct a hearing on the trustee's motion for approval of the settlement and to consider and resolve the application for confirmation of the plan of reorganization.

At a June 12 hearing, Gibbons presented the motion for approval of the settlement and offered testimony on his investigation and evaluation of the claims in the Perelman litigation. By a decision dated June 25, the Court found the terms of the settlement fair and reasonable and entered an order on that date approving it.

That same day, the Secured Lenders and Toy Biz filed the Third Amended Plan that incorporated the terms of the settlement agreement. The Unsecured Creditors, the Equity Committee, the Icahn Interests, and LaSalle objected to that Third Amended Plan.

Toy Biz and the Secured Lenders presented their motion for confirmation of the plan at a hearing on June 30 and July 1. At the conclusion of the hearing, the court reserved decision on whether to grant the motion to confirm the plan.

During the first week in July, the Equity Committee, LaSalle and the Icahn Interests filed appeals to the Third Circuit from the court's order approving the set-

tlement between the Trustee and Toy Biz, the Secured Lenders and others.

### L. *July 1998: The Court Confirms the Third Amended Plan and the Parties Reach a Global Settlement*

By a decision dated July 13, 1998, the court found the Third Amended Plan met all of the requirements of 11 U.S.C. § 1129 and entered an order confirming it. The Unsecured Creditors, the Equity Committee, LaSalle and the Icahn Interests filed appeals to the Third Circuit from the court's order confirming the Plan and moved this court to enter an order staying consummation of the Plan.

On July 31, the parties, including the Unsecured Creditors, the Equity Committee, LaSalle, the Icahn Interests, Toy Biz, the Secured Lenders and the Trustee, filed a paper confirming they had reached a settlement agreement and had consented to an amendment of the Plan. The Fourth Amended Plan included a payment of $3,500,000 to the Icahn Interests, a distribution of warrants to LaSalle for the benefit of the bondholders, and an increase in the warrants to be distributed to the unsecured creditors and the equity security holders. That day the court entered an order approving the settlement. By that order, the court discharged Gibbons as Trustee as of the Consummation Date of the Plan.

### M. *November 1998: Gibbons Applies for a Fee of $4,336,910.00*

On November 16, Gibbons Del Deo filed an application for compensation and reimbursement of expenses incurred in representing the Trustee. It sought $2,372,077 in compensation for the firm's professionals' services calculated by multiplying their billable hours by their standard hourly rates. Connolly, Bove, Lodge & Hutz applied for $279,360.75 in fees and costs. Gibbons' financial advisors, Houlihan Lokey Howard & Zukin Capital, Inc., applied for $622,971 in fees and costs. His accoun-

tants, PricewaterhouseCoopers LLP, applied for $943,669 in fees and costs.

In his application, also filed on November 16, Gibbons describes the work he had done as trustee. His work with Marvel management on the operation of the business included reviewing, evaluating and negotiating new employment agreements and improving cash management and management decisions. For example, he negotiated the sale of Fleer's confections division for $13 million in cash and the assumption of $3.5 million in debt. He arranged for the payment of $4.5 million on account of professional fees and expenses, and for a payment of $11.4 million to the National Basketball Association in connection with a settlement of their claims under a license agreement. In addition, Gibbons reports that Marvel had in excess of $6 million in cash at the time of the consummation of the Plan.

Gibbons describes how he managed Marvel's legal affairs, which he reports were in a "catastrophic state" when he took on his duties as trustee. He negotiated settlements of disputes that had arisen under licensing agreements. He evaluated and managed litigation, including litigation relating to Marvel's rights to Spiderman, litigation with licensors such as the National Basketball Association, and litigation relating to Marvel's assets, such as the Toy Biz governance issues.

Gibbons also describes his efforts to value Marvel's assets and to solicit potential bidders for them. While he retained a financial advisor and provided information on Marvel to a number of potential bidders, the only bid he received was for the purchase of Fleer's confectionary business.

In his application, Gibbons also describes his efforts to negotiate a settlement and a confirmable plan of reorganization including reviewing and evaluating the claims in the Perelman litigation. Gibbons describes negotiations with the Icahn Interests beginning in mid-April 1998, during which the Icahn Interests made clear through a series of offers that they would

not come forward with a plan of reorganization but were interested, instead, in having the Secured Lenders opt for an asset sale. Over the course of these months, Gibbons apparently decided to block proposals that would lead to an asset sale.

Gibbons reports that Toy Biz's March settlement with the Unsecured Creditors resolved a major obstacle to settlement, but left three problems unresolved. First, it did not address the Toy Biz governance issue. Second, it did not remove the threat that the Icahn Interests would persuade the Secured Lenders to agree to an asset sale. And third, the settlement might not have been confirmable, as it provided for a release of claims against third persons, such as Dickstein.

Gibbons reports he resolved these problems and brought the matter to a resolution by concluding that Marvel's claims in the Perelman litigation should be settled, by implementing that settlement with the Secured Lenders and Toy Biz, and by settling with the Icahn Interests so that they would abandon their appeal from the Toy Biz governance decision. Thus he writes:

I firmly believe that achievement of the global settlement was possible only as a result of my decision to concentrate on the earlier settlement of the Toy Biz Governance Litigation, thereby removing the final two obstacles raised by the Icahn–Intrieri Interest and their allies at LaSalle and the Official Equity Committee, and opening the door to a confirmable plan of reorganization. The first such obstacle was whether the Toy Biz Board was lawfully constituted. The other was whether the plan, providing for third-party releases, was legally confirmable. Utilizing those issues to achieve benefits for the unsecured creditors and equity interests reinforced my ability to act as a mediator between the plan proponents and the Icahn–Intrieri camp who were interested primarily in an asset purchase that would have resulted in a liquidation rather than a reorganization.

Gibbons reports that during the period from January 1, 1998 through September 30, 1998, Marvel's disbursements totaled $143,743,695.13 and that pursuant to 11 U.S.C. § 326(a) the maximum compensation allowable to him would be $4,336,910.00.

I believe the services I have rendered in these proceedings justify such a payment, and thus I am requesting the maximum allowable statutory compensation, plus disbursements of $16,938.87.

Gibbons kept a contemporaneous record of the work he did as trustee, noting the nature of the work and the time spent on that work recorded in six minute increments. In his application, he reports he and others worked a total of 1,274.3 hours on the matter from December 17, 1997 to September 30, 1998. The total dollar value of the services if billed at the law firms' standard hourly rates would be in the range of $382,174.50.

In his application, Gibbons notes:

I certify under penalty of perjury that no agreement or understanding exists between me and any other person for a division of compensation for services rendered in, or in connection with, this case, and no division of compensation as prohibited by section 504 of the Bankruptcy Code will be made by me. My compensation will only be shared among members of my firm.

N. *December 1998 and January 1999: Hearings on Gibbons's Fee Application*

Marvel, the reorganized debtor, and the Unsecured Creditors Committee objected to Gibbons's application. On December 15, Gibbons reported to the court that, in light of the objections, he had advised the United States Trustee that he would not seek an award of fees in excess of the amount she would support, and that she supports an award of a commission at a

rate of 1½%. Gibbons also reported that Marvel's total disbursements were actually $137,167,358.48, rather than $143,743,695.13 he had originally reported. Consequently, Gibbons reduced his application to $2,095,760.38.

The court heard testimony and argument on the application on December 17, 1998 and January 7, 1999. At the hearing, Gibbons testified to the following.

He had met with Icahn, Intrieri and their counsel on January 27, 1997, and had concluded based on their discussions that Icahn's strategy was to delay the reorganization effort through litigation, with the intention of encouraging the secured lenders to agree to an asset sale. Gibbons understood Icahn's strategy would result in no payment to the unsecured creditors, no payment to equity, and would leave no money for administrative expenses.

Beginning in mid-March, after Toy Biz and the Secured Lenders filed their Second Amended Plan, Gibbons actively negotiated with each one of the major constituencies in an effort to resolve the disputes between the parties. With regard to the Third Circuit's stay order, he used the stay of any confirmation hearing as leverage in negotiating with Toy Biz to work out the settlement. In mid-May, he reached an agreement with Toy Biz, the Secured Lenders and others, releasing them from claims asserted in the Perelman litigation in exchange for additional consideration for constituents under the plan.

Gibbons offered into evidence a summary showing $44 million as the total savings or benefits to the estate from various transactions that took place during the time he served as trustee, including a savings of $12,437,500 in fees and payments that would otherwise have been made to the DIP lenders, $7,750,000 in proceeds from the Fleer sale over and above earlier offers, and an $11,000,000 savings on the NBA's $22,000,000 administrative claim. He also offered into evidence a table showing estimated values for the Toy Biz plans, with the November 21, 1997 plan having an estimated value to unsecured creditors and shareholders in the range of $4,000,000. The table also shows the Fourth Amended Plan having an estimated value of $11,500,000 in cash and an estimated value of securities in the range of $14,050,000 to $31,910,000.

On cross-examination, Gibbons testified he had taken on the role of trustee after Patricia Staiano, the U.S. Trustee, called his law firm to see if he would be interested in the position. During the nine months from December 1997 to September 1998, Gibbons billed a total of approximately 2,114 hours on all matters, 880 of which were attributable to Marvel. Gibbons confirmed that in 1998, Marvel's President and Chief Executive Officer was paid an annual salary of $400,000, the Chief Financial Officer was paid $250,000 a year, and the General Counsel was paid $200,000 a year. (The Debtor's Chapter 11 Monthly Operating Report for the Month Ended September 30, 1998 was filed on April 27, 1999. It shows Marvel's President and Chief Executive Officer was paid a $100,000 bonus. Consequently, his annual compensation for 1998 was at the rate of $500,000 a year.) Fleer's Chief Executive Officer was paid at the rate of $700,000 a year. Its Chief Financial Officer was paid at the rate of $175,000 a year.

With regard to the sale of the Fleer confectionary business, Gibbons agreed that the buyer had been identified before he was appointed. Furthermore, Gibbons conceded he had no direct involvement in the negotiations.

With regard to the series of settlement agreements that were reached up to and including the July 1998 global settlement agreement, the parties offered testimony showing the following. The first steps towards progress on the global settlement that were eventually incorporated in the Fourth Amended Plan can be traced to the efforts of Jeffrey A. Schultz, Ph.D., a professor of finance at Christian Brothers University in Memphis, Tennessee.

Schultz had been a member of the Official Bondholders Committee and had owned or controlled substantial amounts of both bonds and bank debt.

The court does not recall being aware that Schultz was a player in the litigation or in the resolution of the commercial disputes until his name was mentioned at the December, 1998 hearing on Gibbons's fee application. At the hearing, counsel offered into evidence copies of a number of facsimile memoranda Schultz had sent to representatives of various constituencies in an effort to bring about a settlement. It appears from these documents and from Gibbons's testimony, that Schultz was the driving force behind the negotiations that led to the March 1998 Second Amended Plan incorporating the agreement Toy Biz and the Secured Lenders reached with the Unsecured Creditors Committee. It also appears Schultz was the driving force behind the negotiations that led to the April, 1998 Third Amended Plan that incorporated the agreement Toy Biz and the Secured Lenders reached with the Equity Security Holders Committee.

Lawrence Mittman, Toy Biz's counsel, testified that the July 1998 global settlement that led to the Fourth Amended Plan could be traced to a meeting Dickstein had with Icahn in Las Vegas in May 1998. Apparently, Icahn moved forward towards a settlement after learning on May 29 that the Third Circuit had lifted the *sua sponte* stay order.

Following the hearing, Gibbons Del Deo filed a supplemental application for fees of $221,629.00 and costs of $11,104.47, with $48,150.22 of those fees attributable to preparation of Gibbons's fee application, and $154,645.01 attributable to a defense of his and the firm's applications.

On April 30, 1999, Gibbons filed a Final Report and Account. It shows the Debtors' total disbursements for the nine months from January 1998 through September 1998, excluding intercompany transfers, was $134,302,526.50. The Report includes a calculation showing that the maximum commission at the rates set out in 11 U.S.C. § 326 is $4,052,325.80.

## II. *DISCUSSION*

Gibbons has submitted his application pursuant to 11 U.S.C. § 330, which provides that the court may award a Chapter 11 trustee "reasonable compensation for actual, necessary services rendered." Section 330(a)(3)(A) provides that in determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent and the value of such services, taking into account all relevant factors, including: (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

In his application, Gibbons argues that the court should look to 11 U.S.C. § 326(a) for the purposes of determining what would be reasonable as compensation for his services. It reads:

11 U.S.C. § 326. Limitation on compensation of trustee

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of

such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

Gibbons cites *In re Guyana Development Corp.*, 201 B.R. 462 (Bankr.S.D.Tex. 1996), for the proposition that § 326(a) is intended to provide a percentage compensation scheme for trustees. Gibbons notes that under his reading of this statute, with Marvel having disbursed $143,743,695.13 over the course of the nine months he served as trustee, his compensation should be $4,336,910.00. In his application, he wrote:

> While each case stands on its own factual circumstances, the cited authorities amply support an award of maximum compensation in this case based upon the novelty and complexity of the issues I faced during my tenure as trustee, my special skills and experience, the quality of the representation provided by me and the professionals retained by me, and the results obtained in this rare and exceptional case.

As noted above, Gibbons has agreed to accept an award of half that amount, which is $2,095,760.38.

In *Guyana*, the court appointed an attorney as trustee to collect and liquidate the assets of an oil and gas company that the court described as a complex web of domestic and offshore business structures tied together by insiders who committed pervasive fraud. Over the course of three years, the trustee apparently collected and disbursed approximately $79,938,954.41. The largest creditor, the Internal Revenue Service, had settled litigation with the trustee on its claim of $31,778,014.01, by agreeing to subordinate its lien to the administrative expenses of the trustee. When the trustee filed for compensation of $2,398,348.63, the maximum compensation under section 330 as limited by section 326(a) (and at a rate of $1,600 per hour for his time), the I.R.S. objected.

The court saw the issue as "whether the compensation limits of section 326 are designed as an incentive scheme to encourage maximum asset collection and distribution to creditors by the trustee or are restricted to an hourly capped fee unrelated to the trustee's collection efforts to be set by the Court after the work is done." In awarding the maximum fee as sought by the trustee, the court concluded:

> The compensation scheme enacted by Congress for trustee's fees, however, resolves these issues with a results-oriented sliding-scale percentage of the fund method of compensation for trustees. By incorporating both percentage-based compensation and a reasonableness analysis, Congress creates an incentive to trustees to search for all assets to maximize distribution to creditors as well as promotes a rational relationship between the effort expended and results obtained.
>
> Moreover, by using a sliding percentage scale for trustee commissions, Congress has ensured that the greater proportional effort required at the beginning of a case is commensurately rewarded and that the diminishing effort required as a case proceeds results in a reduced percentage commission. Furthermore, the very small percentage caps set by Congress on the largest amounts disbursed obviates the reasonableness criticisms applicable to class action percentage of the fund compensation.

■ There are a number of problems with this court's analysis. The first is the statute. Section 330 provides that the court may award a trustee reasonable compensation and sets out a number of the factors courts have traditionally looked to in fixing compensation for professional services. These factors include time spent, the complexity, importance and nature of the work done, and amounts customarily paid to comparably skilled practitioners. Section 326 is titled "Limitation on compensation of trustee" and provides that the compensation allowable under section 330

is "not to exceed" certain percentages of the moneys disbursed or turned over by the trustee in the case. Those words in section 326 are not complicated. They do not vary the approach a court should take under section 330 to establish reasonable compensation. They do not establish that a trustee should be paid a commission or percentage of amounts disbursed from the estate. The words in the statute are straight forward: they set a cap or limitation on compensation that might otherwise be paid under section 330. *See In re Greenley Energy Holdings of Pa., Inc.*, 102 B.R. 400, 403 (E.D.Pa.1989) ("[T]rustee fees are subject to two separate limitations. First, section 330(a) allows a trustee 'reasonable compensation' based on the nature, extent, and value of such services including necessary fees for person employed by the trustee. Second, section 326(a) works to put a cap on trustee compensation in excess of a specified amount determined by a formula in that section."). *See also In the Matter of Gulph Woods Corporation*, 150 B.R. 603 (E.D.Pa.1993); *In re Lan Associates XI, L.P.*, No. CIV. A. 98–2286(JEI), 1998 WL 467100 (D.N.J. Aug. 12, 1998).

A second problem with the court's analysis in *Guyana,* is that the reasons the court cites for why the statute should be read to establish a sliding-scale commission do not seem to apply in this or similar cases, in which the trustee is appointed for the purpose of facilitating a reorganization plan. For example, in *Guyana,* the court found in supporting its conclusion: "Congress creates an incentive to trustees to search for all assets to maximize distribution to creditors.... Congress has ensured that the greater proportional effort required at the beginning of a case is commensurately rewarded." In this case, those incentives would not apply, as the trustee did not need to search for assets and he has not argued he should be awarded a higher level of compensation because he made a greater proportional effort at the beginning of the case. Actually, under the percentage compensation scheme, Gib-

bons would receive his highest level of monthly compensation for his final month of service, September 1998. Marvel's disbursements during that month were $27,-402,562.07 and Gibbons's compensation would be $1,370,128.10 for that month. (As Gibbons recorded approximately 25 hours work in September 1998, his compensation for the month under this scheme would be in the range of $55,000 an hour.)

A third problem with the court's analysis is that there does not seem to be any principled relationship between the amounts disbursed by a debtor corporation and what would be reasonable compensation for a trustee appointed to represent the estate. In this case, for example, Gibbons had sought a fee of $4,128,055.00 based on Marvel's disbursements of $143,-743,695.13 during the time he served as trustee. Counsel have not discussed where that number comes from. It appears it is based on disbursements identified in the debtors' monthly operating reports; that is, $143,743,695.13 is the total of the amounts paid out by the debtors over nine months for items such as payroll, rent, interest, advertising, professional fees in the bankruptcy proceeding (including fees paid to Gibbons and Gibbons Del Deo), 401K contributions, travel and entertainment expenses, federal, state and local taxes and monthly bank charges.

That number of $143,743,695.13 reveals very little about the nature of the work Gibbons took on as trustee. In this context it is little more than a number. And the $4,128,055.00 Gibbons had sought as a fee is little more than a product of a mathematical formula, where the total disbursements are multiplied by section 326's percentage caps. Actually, Gibbons's agreement to cut his application in half is no more principled: it just adds the fraction ½ to the formula and leads to a number that is apparently acceptable to the U.S. Trustee in that she will not oppose it.

Gibbons's Final Report demonstrates this again, as it corrects the total number

for Marvel's disbursements for the nine months, down from $143,743,695.13 to $137,167,358.48 to $134,302,526.50. Those corrections, in turn, reduce the trustee's maximum commission from $4,128,055.00 to $4,052,325.80. This $75,729.20 reduction may not seem like much when one is presented with an application requesting millions of dollars. But if one examines this from the perspective of billable hours, with Gibbons's having worked 880 billable hours, the corrections lead to an increase (or reduction) in compensation of $85 dollars an hour for each hour Gibbons worked as trustee. That would be a 20% premium at Gibbons's standard hourly rate of $400, but something less than 2% off the $4,690 an hour rate he had initially sought.

In his reply brief, Gibbons highlights the lack of integrity in this argument by suggesting as an alternative route to this number the court consider looking at this as a common-fund case and award him the $2,095,760.38 as a percentage of the value of the benefit he participated in procuring for Marvel's creditors and equity participants. He fails to cite any cases in support of this proposition which appears to be presented merely to support his proposed number. The court expects there are none.

A fourth problem with this approach of awarding a commission to a trustee based on a percentage of the debtor's disbursements is that it would create a substantial risk of abuse in the selection and appointment of trustees, where a U.S. Trustee may be tempted to steer lucrative appointments to friends or cronies who may or may not otherwise be qualified for the position. In this case, for example, we know that at the time of the petition for a trustee, Marvel's disbursement were in the range of $15,000,000.00 a month. Under the percentage commission approach, in December 1997, when the U.S. Trustee was considering candidates to select, she and the candidate would have known the appointment would pay something in the range of $500,000.00 a month. In this case, the selection process went fairly quickly, and while we know the U.S. Trustee, Patricia Staiano, called Gibbons and offered him the position, the court does not know what was said when she offered him the job, as the U.S. Trustee has claimed privilege as to communications she may have had with Gibbons about what he could expect to be paid. Steering away from the percentage commission approach will reduce the potential for embarrassment to the Judiciary, the U.S. Trustees, and the trustees they select, by criticism that these positions are being doled out for reasons other than the merits of the candidate.

A fifth problem with fixing compensation based on what is in effect the size of the company and the length of time served, is that contrary to what the court suggested in *Guyana*, it gives a trustee quite an incentive to stay in place. That could lead to what one might call the Bull Riding Effect, where a trustee, like a cowboy in the rodeo event, would be compensated based on a combination of the size of the company he draws and his time in the saddle.

Sixth, because this percentage commission approach could lead to extraordinarily high levels of compensation that bear no reasonable relation to the value of the services provided, courts might be discouraged from appointing a trustee when it might otherwise be appropriate. In this case, the Unsecured Creditors Committee identified this issue early on and argued against appointing a trustee, because such an appointment would add administrative expenses and drain money that would otherwise go to creditors, but this court and the Third Circuit rejected their argument.

In his application, Gibbons quotes the Third Circuit's comments on this issue as support for his argument that in a case of this size and complexity the full amount of the statutory permitted commission should be awarded. He writes:

As both this Court and the Third Circuit Court of Appeals have recognized, this

was a case of immense "financial magnitude." *See In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 475 (3d Cir. 1998). In affirming this Court's decision appointing a trustee, the Court of Appeals observed:

We also reject the Icahn interests' arguments that the district court must apply a strict cost-benefit analysis when deciding to appoint a trustee. **This is a case of profound financial magnitude, involving approximately $1 billion in claims against the estate.** See *In re Sharon Steel Corp.*, 86 B.R. 455, 466 (Bankr.W.D.Pa.1988) (**"In a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in ... management."**)

*Id.* (emphasis supplied). I believe that, in large part, my efforts have conferred the enormous benefit anticipated by the Court of Appeals.

At the time this court entered the order providing for the appointment of a trustee, the court had not expected a trustee would seek $500,000.00 (or even $250,000.00) a month in compensation. We can expect the same is probably true for the judges on the Court of Appeals panel. If they had, they probably would not have described a fee of $500,000 a month for a trustee (and former colleague) as insignificant.

Once we recognize that section 326(a) sets a cap on Gibbons's compensation, then we can turn back to the factors in section 330 in an effort to identify what would be reasonable compensation for his services. The Third Circuit's decision in *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833 (3d Cir.1994) offers helpful guidance on a more appropriate approach to this issue. In that case, Kirkpatrick & Lockhart, counsel for the debtor, submitted an application for interim fees pursuant to section 331 that included a request for compensation for services rendered by certain of the firm's paralegals. The bankruptcy court disallowed that portion of the claim, finding it was not compensable, as it was for clerical services. The district court affirmed that decision.

The Court of Appeals, looking to the legislative history of section 330, found that the principal purpose of the 1978 amendments to the statute was to insure that professionals and paraprofessionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts. The court found that the clearest path to that goal is to rely on the market, subject to the modification that the court in reviewing applications will act as a surrogate for the estate by reviewing the fee applications much as a sophisticated non-bankruptcy client would review a legal bill. In reversing the District Court's order, the Court wrote:

We think that although each factor enumerated by § 330(a) retains independent significance, the cost of comparable services factor has an overarching role to act as a guide to the value of the services rendered given their nature and extent.

19 F.3d at 849.

■ The court finds the approach adopted by the Court of Appeals in *Busy Beaver* of looking to an objective market place standard for determining compensation, is the approach the court should follow in determining reasonable compensation for a Chapter 11 trustee under section 330(a). In *Busy Beaver*, the court looked to the non-bankruptcy legal market to determine the compensability and reasonableness of compensation for paralegals. In this case, the court finds the appropriate market for determining reasonable fees for the trustee will depend on the nature of the specific services he provided.

A. *What Services was Gibbons Expected to Provide as Trustee?*

■ Under the Bankruptcy Code, a Chapter 11 trustee is the representative of

the estate and is authorized to operate the business. 11 U.S.C. §§ 323(a) and 1108. In this case, the court identified three principal tasks for the trustee. First, the court appointed a trustee to put a neutral person in control of the business until the litigation and disputes were resolved. In this sense, the trustee was appointed to provide services similar to those that would be provided by a corporate executive, such as a chairman of the board and chief executive officer in that it called for him to oversee the management of the business.

Second, the court appointed a trustee to evaluate the merits of the Perelman litigation and determine whether it would be in Marvel's interests to pursue some, all, or none of the claims asserted in that action. This task required the trustee to provide services similar to those that would be provided by a director of a corporation, in that it called for him to oversee an investigation, to review a legal analysis of claims, and then to make a judgment (and recommendation to the court) as to the merit and value of the claims, including whether Marvel should pursue or settle them.

Third, the court appointed a trustee to evaluate and advise the court on the proposed reorganization plans. This task called for the trustee to provide services similar to those that would be provided by a consultant, in that he and professionals he hired would analyze and advise the court on the adequacy of any proposed plans. In addition, in the course of providing these services, the trustee could solicit alternative plans. It is this task and the leverage he may have had from his position as trustee, that opened for the trustee the opportunity to work with the parties to try to settle their disputes.

B. *What Would Be Reasonable Compensation for the Management Services Gibbons Rendered as Trustee?*

1. *What was the nature of the work Gibbons did in managing Marvel?*

Perhaps the most important role Gibbons took on as trustee was to step into the shoes of the board of directors and hold the business of the company together while the battles over its future were fought among the lawyers, bankers, creditors, shareholders, bondholders, competitors, arbitragers, and other interested stakeholders. While the parties have not emphasized it in their presentations, with all of the push and pull from the bankruptcy proceedings, this must have been difficult work. Gibbons inherited a company that had taken a financial beating and was locked in litigation with competitors and clients seeking to pick off its valuable assets. He was replacing a board of directors that had itself only been in place for six months, and his goal was to hold the company and its employees in place until it was either taken over or liquidated.

It appears he did a good, competent job. That is, it appears he used sound judgment and invested the time and energy that was necessary to protect the value of the company until the parties were able to resolve their disputes. His success no doubt was due in part to his reliance on experienced professionals including Marvel's management team, and the attorneys, investment bankers and accountants he hired to assist him in his work.

Gibbons has testified about a number of the problems he faced in running the business and the decisions he implemented to deal with them. For example, he reached an agreement on interim financing with the Secured Lenders. He negotiated employment agreements with nine Marvel executives. He worked with lawyers in his law firm in negotiating a license agreement between Fleer and the Major League Baseball Players Association. He worked with lawyers in his firm and with other firms to manage a number of pending cases, including between Marvel and the National Basketball Association, and between Marvel and a number of companies over movie rights to Spiderman. He followed through on the sale of Fleer's confections division.

2. *What would be reasonable compensation for these management services?*

If we assume for the moment that Gibbons spent 100% of the time he worked as trustee managing the company, his application for $2,095,760.38 for nine months service would translate to an annual salary in the range of $2,800,000 a year. That would be roughly 6 times the annual salary paid to Marvel's president. Actually, as Gibbons only worked at this part time, the $2,095,760.50 he seeks would convert to the equivalent of an annual salary in the range of $6,600,000. That annual salary is roughly 13 times the president's salary and appears to be unreasonably high.

A second source of information we can look to for the purpose of determining reasonable compensation for Gibbons's services as a corporate executive, is his background, training and prior employment to see what salary he might command if Marvel or others had sought to hire him for this position. Gibbons has spent his professional life working as a lawyer, a judge and a law professor. While he notes in his application that prior to 1970 he had "served as a director of two major business corporations—one in the air service industry and the other in the insurance industry," he has no specific background or experience as a corporate executive. He cannot point to any prior employment or history of compensation as an executive as evidence of the value in the market place of his services as a businessman. This suggests his request for the equivalent of a $6,600,000 annual salary for services as an executive is unreasonably high.

A third factor relevant to this analysis is the work he did and the results he achieved in managing Marvel while he served as trustee. In his application, Gibbons cites to a number of transactions as evidence of what he describes as his "outstanding" and "significant accomplishments" and "the 'enormous benefit' anticipated by the Court of Appeals." These transactions include a renegotiation of the DIP financing, the sale of Fleer's confections business, and the settlement with the NBA.

As to the savings in the costs of DIP financing, it is not so clear this was a significant accomplishment or that it can be attributed to Gibbons. The banks had petitioned for a trustee. In the process of presenting their motion, they had assured the court they would work with the trustee and resolve disputes relating to defaults, fees and adequate protection payments. In appointing a trustee, the court had expected the banks would make these or similar concessions.

With regard to Fleer, as Marvel has pointed out, the buyer had been identified prior to Gibbons's appointment. Further, Gibbons conceded on cross-examination at the December 17, 1998 hearing that he did not play a direct role in the negotiations. The court cannot attribute any substantial accomplishment in this transaction to Gibbons.

It is a little more difficult to assess the significance and value of the work on the NBA settlement. Two factors suggest it may not reflect any extraordinary achievement. First, the NBA never did set out a particularly strong argument in support of its contention that it was entitled to an administrative claim of $22,000,000 and an unsecured claim of $38,000,000. Second, it is not clear Gibbons played a direct and substantial role in the negotiations. It appears this matter was handled by professionals, including lawyers, who reported to Gibbons.

A fourth factor relevant to an evaluation of the reasonableness of Gibbons's application, is what he typically charges for his services. Normally, it would not necessarily be all that helpful to look to a lawyer's income or billing rate for the purposes of valuing his or her services as an executive, but in this case what he normally charges does give us some sense of the value he and others place on his services. Gibbons

Del Deo bills $400 an hour for Gibbons's services as a senior partner. No one has argued that rate is unreasonable. Moreover, it appears to be in line with the market rate for similar legal services (see the attached table). In this context, 2,114 billable hours for the period from December 17, 1997 through September 30, 1998, suggests Gibbons would bill something in the range of 2,681 hours a year. At $400 an hour, his gross billings would be in the range of $1,072,400 a year, and approximately $334,589 for the time he served as trustee. By this standard, Gibbons is seeking compensation at roughly six times the value he and his partners have set for his time.

Each of these factors suggests that the compensation Gibbons seeks is unreasonably high.

For the purposes of determining reasonable compensation for these services, we can turn back to the information we have on the salaries at Marvel. The salaries increased incrementally with the higher status and greater responsibilities of each executive. Marvel's General Counsel was paid $200,000. Marvel's Chief Financial Officer was paid $250,000 a year. Marvel's President was paid $500,000. Consequently, under this incremental scale, and using the $250,000 step increase from Chief Financial Officer to President as a guide, the next step from President to trustee suggests the salary would be something in the range of $750,000 a year. Three quarters of that amount for nine months service would be $562,500 a year. If we reduce that amount to take into consideration that the trustee only worked part time, then the compensation would be in the range of $234,000.

There is nothing in Gibbons's background or employment experience to suggest he would command a salary higher than $750,000 as a corporate executive. On the other hand, we know that as a lawyer he would have billed substantially more for his time. Gibbons should not be penalized for having taken on this work in

running Marvel. Consequently, these factors suggest reasonable compensation for Gibbons's services in running the business should be in the range of $334,589.

One other factor that may be relevant to this analysis is that Gibbons did not give up his practice to become a full time executive at Marvel. This suggests a couple of things. First, he apparently found he did not need to be on the job full-time and was able to rely on Marvel's management team to take responsibility for the day-to-day operation of the business. Second, he put in place a team of professionals on whom he relied to assist him in this work, including his partners at Gibbons Del Deo. Those professionals have filed applications for substantial compensation for work on matters Gibbons relied on in reviewing his performance as a trustee. Third, by taking the approach he did, in working part-time and in calling on the law firm to help run the business, Gibbons was able to spend more than half his time working for and billing other clients.

For these reasons, the court finds that reasonable compensation for Gibbons for stepping in as the equivalent of a chairman and chief executive officer of Marvel on a part time basis for the first nine months of 1998, should be in the range of $334,589.

C. *What Would be Reasonable Compensation for Gibbons's Work in Evaluating the Merits of the Perelman Litigation?*

1. *What was the nature of the work Gibbons did in evaluating the claims?*

The court appointed Gibbons as trustee in December 1997. By May 1998, he completed his investigation and review of the claims in the Perelman litigation and, with the assistance of his firm, had filed a report setting out his analysis of the strengths and weaknesses of those claims. He presented that report at a June 12 hearing in connection with his recommendation that the court approve an agree-

ment he had negotiated settling those claims. Gibbons's report and testimony show that he acted promptly to evaluate the claims and provided the assistance the court had sought in appointing a trustee: he made an informed judgment on whether the claims should be pursued and in doing so he had removed a potential roadblock to approving a reorganization plan.

### 2. What would be reasonable compensation for these services?

Gibbons was an excellent choice to do this work. He has the appropriate education, training and background to do the job and to do it well. He has the background and training to investigate the factual basis for the claims. He has the skills and experience to analyze the basis for the claims. He has the experience to make critical judgments on the value of the claims.

As this work falls within the type of work Gibbons has done and does at his firm, the starting point for a determination under section 330 of reasonable compensation for this work should be the time he spent on this work and the rate he normally charges for his services. The time records Gibbons attached to his application show a number of entries where he recorded time spent on matters relating to the Perelman litigation, including an initial review of documents on January 14, study of issues on January 16, review of correspondence on January 21, arrangements to speed discovery on March 27, review of papers on March 31 and April 1, a conference on April 2, analyzing the claims on April 3 and 4, and meetings with counsel and preparation on April 22 and 23. Most of these time entries were lumped together with work on other matters. The total time for all items where Gibbons referred to work on the Perelman litigation is approximately 57 hours. This suggests that a rough estimate for the time he spent in reviewing and evaluating the claims in the Perelman litigation is probably somewhere in the range of 25 to 30 hours. At 30

hours, billed at $400 an hour, Gibbons Del Deo would normally bill $12,000 for this work. (Again, this amount would not include compensation for the time spent by his partners at Gibbons Del Deo on this matter.)

During these 30 hours that Gibbons worked on the claims in the Perelman litigation, he may have rendered his most valuable service to Marvel, to the court and to the parties in the dispute. Reasonable compensation for this work should recognize the skill he brought to this aspect of his work and the complexity, importance and nature of task.

The court expects that in light of the issues he was called on to review and his unique background and skills, the market would value Gibbons's services in reviewing and evaluating the claims in the Perelman litigation at his standard billing rate of $400 an hour, and that reasonable compensation for these services would be in the range of $12,000.

### D. What Would be Reasonable Compensation for Gibbons's Work in Evaluating Proposed Plans and Working to Achieve a Settlement?

### 1. What was the nature of the work Gibbons did in evaluating the plans and working to achieve a settlement?

The third aspect of Gibbons's work was to evaluate the competing plans, advise the court on the strengths of the alternative plans and, to the extent he could, to work to achieve a settlement. This was clearly the most difficult aspect of Gibbons's work as trustee. One of the problems Gibbons discovered early on was there really were no competing plans. Toy Biz and the Secured Lenders had a plan and demonstrated they were willing to make adjustments to get it done. But the Icahn Interests had no plan; that is, they had no plan other than to use the court procedures to delay and obstruct Toy Biz and the Secured Lenders. It must be they expected

delay and obstruction was to their economic advantage. Not having had much experience as a participant in this type of an event, the court can only speculate that the advantage of delay to the Icahn Interests is that it would create uncertainty, add expense, weaken their opponents' resolve, and increase the likelihood of some further compromise.

While Gibbons could analyze and offer comments on the strengths and weaknesses of Toy Biz and the Secured Lenders's plan, as the litigation progressed, it became clear he was not having much success in influencing the parties and the positions they were taking. When he did find leverage, it was either through taking a position that lacked merit (opposing Toy Biz on the corporate governance issue) or by following Icahn's lead and taking advantage of delays that appeared suspect (the *sua sponte* stay).

Gibbons and Gibbons Del Deo are sophisticated legal professionals. No doubt they would have found leverage if it had been there. That they did not, suggests it may have been unrealistic for the court to expect Gibbons would find and be able to exercise leverage in what was in essence a commercial dispute being fought under bankruptcy court rules.

As it turns out, it was Schultz who took on the role of mediator. And it was the combination of his pushing, prodding and suggestions on compromises that, when combined with the pressure of litigation deadlines, brought this matter to a resolution.

2. *What would be reasonable compensation for these services?*

In light of the position he was put in, Gibbons should not be penalized because he lacked the leverage to get this case resolved. Nor should he be penalized for holding on to the leverage he did find, including the leverage of delay. There is little basis, however, for adopting Gibbons's view that the authorities "amply support an award of maximum compensation ... based upon the novelty and complexity of the issues I faced during my tenure as trustee, my special skills and experience, the quality of the representation provided by me and the professionals retained by me, and the result obtained in this rare and exceptional case."

It is difficult to tell what percentage of his time Gibbons spent on this aspect of his work. A review of his billing records suggests it was probably in the range of up to half of his total of 880 hours, as it involved not only his getting up to speed on what was going on, but also his meetings with the parties and their counsel, his communications with his investment bankers, and communications with his counsel to review and agree on litigation decisions. The court starts with Gibbons's billable rate as a baseline for determining what would be reasonable compensation for these services and finds little reason to vary from it. Furthermore, the court finds Gibbons made no major or unique contribution to bringing this case to a resolution. Accordingly, the court finds reasonable compensation to Gibbons for his work in evaluating the Toy Biz and Secured Lenders' plan and in working to try to bring the parties to a settlement, would be compensation for this time at his normal hourly rate; that is, $400 an hour for that portion of the 880 hours he performed these services. If one half is a reasonable estimate of the time he spend on this aspect of his work, the value of those services at his $400 hourly rate would be in the range of $176,000.

E. *What Would Be Reasonable Compensation for Gibbons's Other Work as Trustee?*

1. *What was the nature of the other work Gibbons did as trustee?*

There is one aspect of Gibbons's work as trustee that the court had not anticipated prior to entering an order for the appointment of a trustee: his work before the Court of Appeals defending his decision to

hire his partners to serve as his lawyers. The time records Gibbons attached to his application show a number of entries in which he recorded time spent working on that appeal, including a conference with members of his firm on January 27, and work on papers for the appeal on January 28, January 29, January 30, January 31, February 1, February 2, February 5, February 6, February 7, February 9, February 10, February 11, February 13, February 14, February 16, and February 18, and work in preparation for the oral argument on March 2, March 3, March 5, March 6, March 9, and March 10. Most of these time entries were lumped together with work on other matters. The total time for all items where Gibbons referred to work on the appeal is approximately 128 hours. Using the approach we took on the hours Gibbons worked on the Perelman litigation and estimating that roughly half of the recorded time would be attributable to this work (for Perelman it was 25 to 30 out of a total of 57 hours), we can estimate that Gibbons probably spent something in the range of 60 to 65 hours working on the appeal.

### 2. *What would be reasonable compensation for these services?*

At $400 an hour, Gibbons would normally bill this work at something in the range of $24,000. The court finds that to be a reasonable amount for these services.

### III. *SUMMARY AND CONCLUSION*

■ In summary, the court entered an order in December 1997 directing that a trustee be appointed to represent the debtor in this case, manage the business, evaluate litigation that had been filed on its behalf, and review and comment on competing plans for reorganization. The U.S. Trustee selected as trustee John J. Gibbons, a former judge, who has outstanding credentials for one aspect of the job (evaluating the litigation), no background for another (managing the business), and who came in and got knocked around in the third (trying to mediate a settlement).

After six months of delays and stays, the lawyers, principals and a finance professor were able to work it out pretty much without him and in some ways despite him. Now, with the settlement behind us, the trustee has applied for fees.

Ironically, Gibbons has shown poor judgment in applying for compensation. Just stating the amounts sought should have been sufficient to suggest that what he was seeking was unreasonable: $4,336,910.00 for half-time work for nine months; $4,336,910.00 for 880 hours of work; $4,928 an hour.

As set out above, the court finds the factors in 11 U.S.C. § 330 suggest reasonable compensation for John J. Gibbons for his service as Trustee for Marvel Entertainment Group, Inc. is the market rate for compensation for these services. To the extent Gibbons provided services that are in the nature of work as a corporate executive or director, the market rate would be slightly less than what he charges for his work as a lawyer. To the extent he provided services that are similar to the work he has done as a judge and now does as a lawyer, the market rate is the rate he charges for his time, which is $400 an hour. This suggests that reasonable compensation for his services is $400 an hour for the 880 hours he recorded for this work, for a total of $352,000.

The court will enter an order in accordance with this decision.

Summary of certain billing rates for bankruptcy attorneys based on information submitted in connection with fee applications submitted to the District Court in 1998. The summary identifies the firm, the debtor, the civil action number, the billable rate per hour, and the year admitted to practice law.

| Law Firm | Case | CA No | Sum Assoc | 1998 | 1993 | 1990 | 1990 | 1989 | 1988 | 1987 | 1986 | 1985 | 1984 | 1983 | 1982 | 1981 | 1980 | 1979 | 1978 | 1977 | 1976 | 1975 | 1974 | Before 1973 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adelman Lavine Gold & Levin | Phoenix Information Systems | 97-2498 | | | | | | | | | | | 260 | | 275 | 275 | | | | | 295 | | | 275 | |
| Alschuler Grossman & Pines | Marvel Entertainment | 97-638 | | | | | | | | | | | | | | | | | | | | | | 375/500 |
| Duane Morris & Heckscher | Marvel Entertainment | 97-638 | | | | | | 270 | | | | | | | | | | | | | | | | |
| Gibbons, Del Deo, Dolan, Griffinger & Vecchione | Marvel Entertainment | 97-638 | 90 | 125 | 309 | 200 | | 250 | | 208 | 225 | | | 290 | 250 | 235 | 225 | 275 | 325 | 273 | | | | 230/350/400 |
| Greensfelder, Hemker & Gale, P.C. | Venture Stores | 98-101 | | | | | | | 175 | | 170 | | 175 | | | | | | 200 | | | | | 195/260 |
| Hoyle, Morris & Kerr | Marvel Entertainment | 97-638 | | | | 200 | | | | 275 | 275 | | | | | | | | | | | | | |
| Kaye Scholer Kireman Hays & Handler | Marvel Entertainment | 97-638 | 130 | | | 300 | 305 | | | | | | | | | 450 | | | | | | 385 | | 415 |
| LeBoeuf, Lamb, Greene, MacRae | Phoenix Information Systems | 97-2498 | | 190 | 265 | 325 | | | 325 | | | 475 | | | | | | | | | | | | 425/475 |
| Morris James Hitchens & Williams | Phoenix Information Systems | 97-2498 | 60 | 105 | | 250 | | | | 225 | | | | 250 | | | | | | | 250 | | | 352 |
| Moses & Singer | Phoenix Information Systems | 97-2498 | | | | | | | | | | | 325 | | | 330 | | | | | | | | 425/325 |
| Otterbourg, Steindler, Houston & Rosen | Venture Stores | 98-101 | | 150 | | | | | | | | | | | 410 | | | | 410 | | | | | 440/440 |
| Pepper Hamilton & Scheetz | Venture Stores | 98-101 | | | | 215 | | | | 220 | | | | | | | 300 | 290 | 410 | | | | | 340/280/345/340 |
| Weil Gotshal & Manges | Marvel Entertainment | 97-638 | 120 | 190 | | 320 | 325 | | 400 | | 420 | | | | | | | | | 500 | | | | 550 |
| White & Case | Marvel Entertainment | 97-638 | | | | | 385 | 385 | | 450 | 435 | | | | | | | | | | | 250 | | 505 |
| Wilkie Farr & Gallagher | Marvel Entertainment | 97-638 | 150 | 240 | 295 | | 295 | | | 325 | | | | | 465 | | | | | 510 | | | | 510 |
| Young Conaway Stargatt & Taylor | Strawberries | 97-309 | | | | 260 | | | | 325 | | | | | | | | | | | | | | |