**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

In re: COMMERCIAL FINANCIAL
SERVICES, INC.,

Debtor.

---

HOULIHAN LOKEY HOWARD &
ZUKIN CAPITAL,

Appellant,

v.

UNSECURED CREDITORS'
LIQUIDATING TRUST; ABS
LIQUIDATING TRUSTEE;
COMMERCIAL FINANCIAL
SERVICES, INC; CFS
LIQUIDATING TRUSTEE; CF/SPC
NGU, INC., UNITED STATES
TRUSTEE,

Appellees.

No. 03-5161

---

**Appeal from the United States Bankruptcy
Appellate Panel of the Tenth Circuit
(BAP No. 03-007)**

---

Richard Alan Chesley, Jones Day, Chicago, Illinois, (Christina E. Murray, Jones
Day, Dallas, Texas, and David A. Cheek, McKinney & Stringer, P.C., Oklahoma
City, Oklahoma, with him on the briefs) for Appellant.

Robert S. Glass (David M. vonHartitzsch with him on the brief), Glass Law Firm P.C, Tulsa, Oklahoma, for Appellee Unsecured Creditors' Liquidating Trust.

Joshua Waldman, Attorney (Peter D. Keisler, Assistant Attorney General, and Williams Kanter, Attorney, and R. Craig Green, Attorney, Civil Division, Department of Justice, and Donald F. Walton, Acting General Counsel, and P. Matthew Sutko, Attorney, Office of the General Counsel, Executive Office for U.S. Trustees, with him on the brief) Washington, D.C., for Appellee United States Trustee.

---

Before **EBEL, McKAY** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

The bankruptcy court denied, in part, Houlihan, Lokey, Howard & Zukin Capital's (Houlihan) requested professional fees in the amount of $1,920,967.74. The court determined the entire fee was unreasonable under 11 U.S.C. § 330 and reduced the amount to $904,000 for Houlihan's services. Houlihan challenges the bankruptcy court's reasonableness conclusion and its methodology in determining the reduced award. We exercise jurisdiction under 28 U.S.C. § 158(d) and AFFIRM.

## I. BACKGROUND

Commercial Financial Services, Inc., (CFS) filed a voluntary petition for Chapter 11 reorganization on December 11, 1998, in which it was joined by its wholly owned subsidiary, CP/SPC NGU, Inc., (NGU) on December 14, 1998. On

December 23, 1998, the United States Trustee appointed a committee to represent creditors holding asset-based securities (ABS Committee) pursuant to 11 U.S.C. § 1102(a)(1). Also involved were various unsecured creditors who were represented by the Unsecured Creditors' Liquidating Trust (UCL Trust).[1]

On January 7, 1999, the bankruptcy court issued a standing order setting forth the guidelines for professional fee applications. The court found good cause existed "for establishing an orderly and uniform procedure for professionals seeking compensation and reimbursement of expenses from the estate." (R., Vol. 1, Doc. 2 at 0039). The order required all professionals to file interim reports containing the hourly rate charged on the case.[2] It informed potential professionals the United States Trustee Guidelines would apply, and in addition, notified them that they would be compensated at a rate commensurate "to the expertise necessary to perform the task, rather than the ordinary rate charged by the person." (*Id*. at 0040, 0042).

---

[1] Initially, the unsecured creditors were represented by the Official Committee of Unsecured Creditors. By virtue of the Second Amended Plan of Liquidation, the Official Committee was replaced by the Unsecured Creditors Liquidating Trust. For ease of reference, we will refer to both entities as the UCL Trust.

[2] "The Court will consider the following criteria in evaluating Fee Applications filed in this case: 1. **Hourly Rates**. The primary criterion used to evaluate the reasonableness of the hourly rate charged will be the amount reasonably charged by a person possessing the skill, experience and expertise **required to perform the given task**." (R., Vol. 1, Doc. 2 at 0042.)

Pursuant to 11 U.S.C. § 1103, the ABS Committee filed an application with the bankruptcy court on February 3, 1999, to employ Houlihan as a financial advisor. Attached to the application was an affidavit required by Bankruptcy Rule 2014(a) from Houlihan's managing director, Michael Kramer, describing Houlihan's proposed fee agreement. According to Kramer, Houlihan's proposal stated that "[s]ubject to the Court's approval, Houlihan [] will charge the Debtors for its financial advisory services a financial advisory fee of $200,000 per month. In addition, Houlihan [] will reserve the right to seek, . . . subject to the approval of this Court, a fee in excess of the monthly advisory fee at the conclusion of these [proceedings]." (Appellant's App. at 0065.)

The United States Trustee and the UCL Trust objected to the proposed retention of Houlihan, in part because Houlihan had failed to fully explain prior payment from the estate for its financial advice to the ABS Steering Committee. On March 9, 1999, the bankruptcy court held a hearing at which Kramer testified regarding its prior work for the ABS Steering Committee and the proposed agreement with the ABS Committee. He stated he understood the payment of fees would be "[s]ubject to the approval of the court" as well as to "final review by the Bankruptcy court as to the relative fairness" of the proposed fee. (Appellant's App. at 0289.) The court did not resolve the fee issue, but noted that under the January 1999 Order, Houlihan was required to record its time on an hourly basis.

On October 1, 1999, after the previous payment issues were resolved, the bankruptcy court retroactively authorized the ABS Committee to retain Houlihan from January 4, 1999, to June 30, 1999, (first retention period) as a financial advisor, but did not discuss the terms of compensation.

On March 22, 2000, the ABS Committee filed a second retention application seeking to re-employ Houlihan to help with liquidation negotiations. Again, Houlihan noted its proposed fees of $75,000 per month were "subject to the approval of this Court . . . ." (Appellant's App. at 0340.) Houlihan's proposal also acknowledged it continued to be bound by the court's January 7, 1999 standing order requiring professionals to keep and file time records. On March 30, 2000, the UCL Trust filed its response. It did not object to the retention of Houlihan, but did object to the proposed fee arrangement. Specifically, it wanted assurance that Houlihan would be required to keep contemporaneous time records and be compensated only for the actual time and expenses necessary to perform its services.

On April 4, 2000, the Bankruptcy court conducted a hearing at which it considered the renewed application to retain Houlihan. Counsel for the ABS Committee explained that Houlihan's prior employment had been approved by the bankruptcy court,

> with the understanding, . . . notwithstanding the terms of the engagement, that Houlihan[] would have to keep time records . . .

and that [its] ultimate compensation and reimbursement of expenses would be dependant upon the content of that application, the amount of time and the reasonableness of the expenses that were spent.

(Appellant's App. at 0387.)  Addressing Houlihan's reservation to request a deferred transaction fee,[3] counsel stated:

[W]e are simply alerting the Court on behalf of Houlihan [] that they reserve the right to ask for such.  Absolutely no representations have been made by the ABS Committee to the Houlihan [] firm that one is guaranteed or that one will be given.  Whatever happens, happens.

(Appellant's App. at 0401.)  After listening to argument from all counsel, the court approved Houlihan's retention, but further ordered Houlihan shall:

keep contemporaneous time records and documentation of expenses for which fees and reimbursement may be sought and shall comply with the [January 7th, 1999, standing fee application] order . . . . The Court will expect that evidence as to the reasonableness of hourly rates will be presented in connection with the presentation of a fee application.

(Appellant's App. at 0403.)  Accordingly, on April 18, 2000, the bankruptcy court issued its second retention order authorizing the ABS Committee to rehire Houlihan (second retention period).

On October 18, 2001, Houlihan filed its Final Fee Application seeking fees and expenses[4] incurred for the first retention period, January 4, 1999 through June

---

[3] A transaction or success fee is usually awarded when there has been a sale of assets or a successful restructuring and the company continues to exist as going concern.

[4] Expenses are not at issue on appeal.

-6-

30, 1999, as well as the second retention period, March 22, 2000 through August 29, 2001.[5] Houlihan requested approval, based on its monthly fee of $200,000, for professional fees in the amount of $1,174,193.55 for the first retention period. It also requested $746,774.19 based on a $75,000 per month fee for the second retention period between March and September 2000, a $50,000 per month fee for October to December 2000, and a $25,000 per month fee for January through May 2001. Houlihan submitted time reports of a total of 1,915.10 hours during the first retention period and 633.70 hours during the second retention period. The compensation requested by Houlihan totaled $1,920,967.74 exclusive of expenses.

On December 12, 2001, UCL Trust filed an objection alleging, among other things, that the fees were unreasonable and that Houlihan had failed to comply with the bankruptcy court's standing orders by charging a monthly, as opposed to an hourly, fee. Although Houlihan responded with a second supplemental fee application on January 2, 2002, it did not change its request for fees. The United States Trustee filed an objection on February 12, 2002, claiming Houlihan's fees were excessive and Houlihan should be compensated in a similar manner as other professionals.

---

[5] Houlihan supplemented its request twice. The first supplemental application, on November 14, 2001, withdrew a request for reimbursement of legal fees. The second supplemental application, filed January 2. 2002, reduced claimed expenses by $5,000, but did not alter its request for fees.

The bankruptcy court heard the matter on March 26, 2002. Houlihan argued that the court's review of its application for fees was under 11 U.S.C. §328, allowing an alteration of fees only when the terms of employment "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms . . . ." 11 U.S.C. §328(a). From the bench, the court approved the payment of $41,026.56 to Houlihan for the reimbursement of expenses. However, it vigorously rejected Houlihan's contention that it employment was unconditionally preapproved under Section 328(a). Instead, it ruled "all fees and expenses . . . are subject to review under Section 330." (Appellant's App. at 1112-13.) The court denied Houlihan's application for fees but stated it would reconsider if Houlihan "elects to comply with the guidelines, as previously order[ed] and as requested by the UCL Trust and the United States Trustee." (*Id*. at 1114.) The court also instructed Houlihan that it "must . . . demonstrate by competent evidence appropriate hourly rates, as required by the guidelines." (*Id*.) The bankruptcy court's decision was memorialized in an April 12, 2002 order.

In response to the bankruptcy court's order, Houlihan filed a third supplemental application for fees on May 24, 2002. In its third supplement, Houlihan provided the bankruptcy court with an analysis of its time spent on the case broken down into task categories as required by the United States Trustee

-8-

Guidelines. Houlihan's requested fees during the first retention period amounted to $613.96 per hour, while its requested fees during the second retention period amounted to $1,173.99 per hour. The overall average hourly rate for both periods was $750.79. Houlihan also provided an analysis of its fee arrangements in previous restructuring arrangements arriving at an average hourly rate of $1,371.00 in previous cases. On June 11, 2002, the UCL Trust filed its second response and objection to Houlihan's proposed fees, again arguing they were unreasonable as compared to the other professionals in the case. The United States Trustee filed its second response and objection on June 11, 2002. It, too, argued Houlihan's proposed fees were unreasonable and suggested the bankruptcy court should look to the other professionals involved in the case to determine a reasonable value for Houlihan's services.

On June 18, 2002, the bankruptcy court conducted a hearing on Houlihan's application and supplements as well as the objections made by the UCL Trust and the United States Trustee. At the hearing, Houlihan provided testimony that it was not its custom to bill on an hourly basis. In addition, it maintained that its services were not comparable to the other professionals in this case because (1) Houlihan did not consider them competitors with equivalent marketplace value and (2) the other professionals "provided bits and pieces of services that Houlihan provided all of." (Appellant's App. at 1371.)

On January 10, 2003, in its final order, the bankruptcy court found Houlihan's requested fees unreasonable under 11 U.S.C. § 330 and instead awarded it a total of $904,000 ($662,000 for the first period; $242,000 for the second period). In determining a reasonable fee, the bankruptcy court initially assessed the number of hours worked by the various Houlihan professionals in each period, irrespective of the varying difficulty of the work. The court then compared the experience of the Houlihan professionals to that of the other professionals, InteCap, Policano, ABS LLC, and DSI, who were retained in the case and noted the hourly fees charged by the other professionals in this case. The court also determined the rates for less experienced professionals comparable to Houlihan's younger associates in the present case ranged between $120 to $375 per hour. The court next examined Houlihan's rates in previous cases and pointed out that, in those case, Houlihan's senior employees had earned between $356 to $409 averaged hourly rates. Based on its independent examination of the record, the court determined that the individual rates for Houlihan's professional employees should be: $400 an hour (Mr. Kramer); $390 an hour (Mr. Hilty); $300 an hour (Ms. Aalto); $275 an hour (Mr. Mooney). The respective hourly rates multiplied by the actual hours worked by each individual amounted to the total fee of $904,000 awarded by the bankruptcy court.

On January 20, 2003, Houlihan appealed the amount of the award to the

Bankruptcy Appellate Panel (BAP) which had jurisdiction under 28 U.S.C. § 158(b) and (c). On August 27, 2003, the BAP affirmed the bankruptcy court's fee award. This appeal followed.

## II. DISCUSSION

"On appeal from BAP decisions, we independently review the bankruptcy court's decision." *In re Lampe*, 331 F.3d 750, 753 (10th Cir. 2003); *In re Albrecht*, 233 F.3d 1258, 1260 (10th Cir. 2000); *Phillips v. White (In re White)*, 25 F.3d 931, 933 (10th Cir. 1994). "[W]e review the bankruptcy court's legal determinations *de novo* and its factual findings under the clearly erroneous standard. A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir. 2002), quoting *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996). Additionally, "[j]udicial review of the bankruptcy court's factual determinations in connection with a fee award is highly deferential" and reviewed for clear error. *In re Miniscribe Corp.*, 309 F.3d at 1244. *See Rubner & Kutner, P.C. v. U.S. Trustee (In re Lederman Enters., Inc.)*, 997 F.2d 1321, 1323 (10th Cir. 1993).

The award of professional fees in bankruptcy cases is governed by 11 U.S.C. § 330. That provision covers both the court's ability to declare a fee

-11-

unreasonable and to independently determine reasonable fees. Under 11 U.S.C. § 330(a)(1), bankruptcy courts have wide discretion in awarding compensation to attorneys, trustees, and professionals so long as it is reasonable. *In re Miniscribe Corp.*, 309 F.3d at 1244. The statute further provides, that "[i]n determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services. . . ." 11 U.S.C. § 330 (a)(3) In order to do this, the court must take

> into account all relevant factors, including–**(A)** the time spent on such services; **(B)** the rates charged for such services; **(C)** whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; **(D)** whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and **(E)** whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A)-(E). If a court determines that a proposed fee is unreasonable, it may **"award compensation that is less than the amount of compensation that is requested."** 11 U.S.C. § 330(a)(2).

Houlihan insists the bankruptcy court erred in rejecting its request for normal marketplace compensation and imposing compensation based on an hourly rate. Houlihan argues: (1) 11 U.S.C. § 330's language and case law do not require professionals to be compensated on an hourly basis (Appellant's Br. at 26-30); (2) Houlihan's monthly rate constituted compensation at a market rate which

bankruptcy courts are obliged to follow (Appellant's Br. at 30-33), and; (3) the bankruptcy court unfairly changed Houlihan's rates from what the court initially authorized. (Appellant's Br. at 33-37.) In addition, Houlihan argues the bankruptcy court erred by comparing the rate of other professionals involved in the bankruptcy proceeding because Houlihan's services were uniquely applied to this complex matter.

*A. The Bankruptcy Court Used Hours to Evaluate the Reasonableness of Houlihan's Requested Fee*

We use an adjusted lodestar analysis to determine the reasonableness of a requested professional fee within the context of § 330. *See In re Miniscribe Corp.*, 309 F.3d at 1243-44 (applying lodestar analysis to trustee's fees under § 330); *In re Lederman Enters., Inc.*, 997 F.2d at 1323 (attorney's fees). The lodestar analysis takes into account each of the factors specifically mentioned in § 330(a)(3) plus additional relevant factors. As articulated in *Johnson v. Georgia Highway Express*, Inc., these additional factors include the novelty and difficulty of the task, the requisite skill level, whether the case precluded other employment, the contingent nature of the fee, time limitations, the amount of money involved and results obtained, and the experience, reputation, and ability of the trustee. 488 F.2d 714, 917-19 (5th Cir. 1974). The burden is on the party requesting fees to prove its request is reasonable.

-13-

Houlihan argues its rates are reasonable because measuring time on a monthly basis is common marketplace practice. Houlihan's market-based argument confuses acceptable billing methods with whether the rate used under such methods is reasonable. While it may be true that other firms involved in bankruptcy cases bill on a monthly rate, that does not inform the reasonableness inquiry. To answer that question, a bankruptcy court must ask, among other things, how much time a professional firm spent on a case to earn the fee. Without some method of comparison between monthly fees billed in various cases, such as time spent on a project, a bankruptcy court will be consigned to approving any monthly fee plucked out of "the marketplace." Houlihan provided no basis for comparison,[6] so the bankruptcy court had to create its own based on hours worked. To merely copy monthly billing rates from competitors in unrelated proceedings invites a finding of reasonableness simply because their monthly billing system is common, even though those firms might actually have committed a substantially divergent amount of resources to the case. We decline to allow billing at a monthly rate to be an automatic insulator from the reasonableness inquiry. Nor is Houlihan's mantra of the "the marketplace" sufficient to preclude a bankruptcy court from using a constructive hourly rate to

---

[6] As the bankruptcy court pointed out, "Houlihan [] failed to establish that the services rendered in those [previous] matters were comparable to the services it rendered in this case." (Appellant's Br., Attachment A at 11.)

compare divergent fees in multiple unrelated proceedings.

Based on the statutory language alone, under 11 U.S.C. §330(a)(3), a bankruptcy court is directed to consider at least five factors, among which four either explicitly or implicitly direct a bankruptcy court to examine the amount of time spent on a project. The statute does not specify the unit of time to be used, but hours appear to be a useful measure for comparison with other professionals' services, for determining a rate, and especially for evaluating whether the actual amount of time spent was reasonable. Houlihan concedes that during some months it spent very little time on the case but still billed at the monthly rate. Thus, using a monthly time frame as the only basis for determining fees obscures the actual amount of effort devoted to the case. The lack of any case law requiring a bankruptcy court to evaluate professional fees on an hourly basis does not foreclose the court's discretionary ability to do so. Houlihan's repeated statements that the purpose of the statute was to create flexibility in fee determinations only supports the bankruptcy court's actions rather than proscribing them.

It is important to make two additional observations. First, the record clearly demonstrates Houlihan knew and acknowledged its proposed monthly fee contract was only a proposal and was subject to the fee procedures articulated by the bankruptcy court. This included the bankruptcy court's orders requiring

Houlihan to record the number of hours it worked. Moreover, the bankruptcy court specifically reserved its final determination of the reasonableness of requested fees. In fact, at the hearing on March 9, 1999, held to address the other parties' objections to Houlihan's fee arrangement, Mr. Kramer testified he understood Houlihan's fees were "subject to the approval of the Court . . . as to the relative fairness or whatever the exact standard is." (Appellant's App. at 0289.) Thus, Houlihan's claims that the bankruptcy court impermissibly changed the terms of its compensation and "violated all notions of fundamental fairness" by imposing an hourly compensation standard after Houlihan had completed its work are without merit. (Appellant's Br. at 25.) Similarly, its assertions that no party objected to its proposed rates during the pendency of the bankruptcy proceedings ignore the repeated statements of the UCL Trust that the reasonableness of the proposed fee would be determined by the court when the appropriate time came.

Second, even though Houlihan frames the issues as legal questions throughout its brief, it continually invites this Court to evaluate the discretionary determination of whether its proposed fees were in fact reasonable. Houlihan frequently references the undisputed evidence about the high quality of its complicated and unique work which adheres more to the question of reasonableness than to whether the bankruptcy court was authorized under the

statute to consider a constructive hourly rate.  (Appellant's Br. at 38, 43-46.)  We decline Houlihan's implicit invitation.  The bankruptcy court did not overstep its powers under § 330(a) by requiring Houlihan to keep track of its hours.

*B. The Bankruptcy Court's Power to Determine Comparative Fees*

Houlihan further argues that the court erred in imposing an improper effective hourly rate because it (1) ignored evidence of Houlihan's prior effective hourly rates charged in bankruptcy cases and (2) compared Houlihan's services to other financial professionals involved in the case.

If a bankruptcy court determines a proposed fee is unreasonable, it may "award compensation that is less than the amount of compensation that is requested."  11 U.S.C. § 330(a)(2).  In determining the new amount, the bankruptcy court looks to the factors in 11 U.S.C. § 330(a).  Ordinarily, the statute requires bankruptcy courts to look at "the customary compensation charged by comparably skilled practitioners in cases other than cases under this title."  11 U.S.C. § 330(a)(1)(E).

Despite its protests, Houlihan eventually provided the bankruptcy court with fees from prior bankruptcy proceedings in which it was required to keep time records.  The bankruptcy court used this evidence to calculate Houlihan's effective hourly rate in prior bankruptcy proceedings as $262 to $3,271 an hour, with an average rate of $1,371 an hour.  Houlihan argues that because the

effective hourly rate requested in this case was only $751 an hour, 44% less than its average in other bankruptcy proceedings, the requested fee was reasonable on an hourly basis.

However, the $1,371 an hour average rate determined by the court and relied upon by Houlihan as a point of comparison includes success or transaction fees. The bankruptcy court also calculated the effective hourly rate for Houlihan's prior engagements excluding transaction fees and derived an average blended hourly rate of $409 an hour. Additionally, the bankruptcy court examined a subset of six cases where no transaction fee was awarded and derived an average fee of $356. On appeal, Houlihan argues that the bankruptcy court's calculation of Houlihan's effective hourly rate from six prior engagements is flawed because it fails to account for the absence of a transaction fee in those cases. Houlihan argues, "in this engagement, Houlihan Lokey not only had the right to seek a transaction fee, but it was specifically contemplated that Houlihan Lokey would be seeking such an incentive fee. To the contrary, in the six engagements referred to by the Bankruptcy court, a success or transaction fee was not available to Houlihan Lokey, and thus not part of the available compensation package." (Appellant's Br. at 41, n. 4.)

In light of the record, Houlihan's argument is puzzling. According to Richard Chesley, Houlihan's general counsel, chief legal officer and a senior vice

president in the financial restructuring group, Houlihan chose not to seek a transaction fee in this case. This makes the present case more analogous to the six non-transaction fee cases used by the bankruptcy court to calculate Houlihan's effective hourly rate, not less. The theoretical availability of a transaction fee in this case is an insufficient basis to distinguish the prior six cases for the obvious reason that the transaction fee was not actually requested. Additionally, the rate imposed by the bankruptcy court ($353.32 an hour)[7] was within the range established by Houlihan's evidence ($262 to $1,371 an hour), not far from the average in all cases excluding transaction fees ($409 an hour), and was right at the average rate charged in other non-transaction fee cases ($356 an hour). Finally, and most importantly, there is nothing in the statute that requires the bankruptcy court to award success or transaction fees or to account for them in the calculation of a reasonable fee. In light of this, we cannot say the bankruptcy court impermissibly ignored Houlihan's proffered evidence of its prior bankruptcy case rates.

Additionally, the bankruptcy court looked to the other financial advisors in the case who were working for the unsecured creditors. Specifically, the

---

[7] This average is derived from dividing the $904,000 in fees awarded by the bankruptcy court by the 2558.6 total hours worked by Houlihan during both retention periods. The individual retention period averages are $346.14 an hour for the first period and $374.55 an hour for the second.

bankruptcy court looked at the rates charged by other financial firms in the case, namely, InteCap, Policano, ABS LLC, and DSI.[8]  In any event, the court was apparently placed in this position because Houlihan was unable to provide the court any useful information concerning hourly rates Houlihan charged for other financial work outside of Chapter 11 proceedings.

In its brief, Houlihan goes to great pains to distinguish the quality and nature of its work from all of the other financial advisors present in the case in an apparent effort to demonstrate that its employees were of an entirely superior class and should not be compared with the other financial advisors.[9]  The principle distinction Houlihan attempts to create comes from its routine request for monthly, as opposed to hourly, fees and that the functions performed by each

---

[8] It is unclear whether the rates provided by the other financial planners were bankruptcy or non-bankruptcy related.  The bankruptcy court only describes the rates provided by the other financial advisors as "supported by competent evidence of customary compensation charged by comparably skilled professionals."  (Appellant's App. at 6.)  Although this might raise concerns under § 330(a)(1(E)(directing courts to look at "cases other than cases under this title"), Houlihan does not argue that the bankruptcy court impermissibly looked at bankruptcy rates to determine its fee.  Rather, Houlihan argues the other financial advisors are of a categorically different class, thus defying comparison.

[9] Houlihan calls the court's comparison of its services to the other financial advisors in the case an "overly simplistic and arcane 'apples to oranges' approach" that is "unsupported by the applicable law or the factual record." (Appellant's Br. at 43.)

were not identical.[10]

Houlihan's efforts are unconvincing primarily because the statute only requires "comparably skilled practitioners," 11 U.S.C. § 330(a)(1)(E), not identically skilled or functionally equivalent ones. The professionals the bankruptcy court used as comparisons to Houlihan were also financial advisers, who Houlihan concedes are "highly competent and qualified." (Appellant's Br. at 46.)[11] Moreover, the bankruptcy court focused on the educational background and professional experience of all financial advisors in this case. To the extent Houlihan provided more services than the other financial professionals it was compensated by receiving more hours of billable time. Thus, because the statute only requires looking at the comparable skill of the financial advisers and not exact functional equivalence, it was proper for the court to compare all financial advisors.

Houlihan attempts to distinguish the other financial advisors based on the fact they charge hourly rates, as opposed to Houlihan's method of monthly billing, and that the other advisors were not employed for the entire duration of

---

[10] Thus, Houlihan argues DSI provides day-to-day managing of bankrupt companies, Policano is essentially an accounting firm that does not do valuations, Intecap primarily provides litigation support including evaluations of third party claims, and ABS provided only specialized and "highly discrete" financial analysis. (Appellant's Br. at 49.)

[11] Nevertheless, Houlihan calls the comparison a "vacant conclusion that their services were substantially comparable." (Appellant's Br. at 46.)

the proceedings. Both arguments fail. As we have already pointed out, Houlihan's differentiation in this case between monthly and hourly billing methods is untenable and does not insulate it from comparison to other firms. Moreover, the difference in the amount of time spent on the case between Houlihan and the other financial advisors is reflected in the total amount of money received, not the rate at which the advisor bills. Finally, even if we were to assume Houlihan was more skilled than the other financial advisors in this case, we note the bankruptcy court awarded Houlihan's employees a fee at the "high end" of the pay scale for comparable financial advisors. (Appellant's App. at 11 n. 17.) Houlihan, however, has provided no legitimate basis for concluding it is a categorically superior financial firm.

CONCLUSION

We hold the bankruptcy court was well within its powers under 11 U.S.C. § 330 to require Houlihan to track and report the number of hours it worked and to use that information in the reasonableness evaluation of Houlihan's requested fees. We also hold the bankruptcy court appropriately calculated a reasonable fee by looking to the rates charged by other financial advisers working in the same proceedings. We AFFIRM the bankruptcy court's award of fees.